## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BARBARA TULLY, KATHARINE BLACK, MARC BLACK, SHELLY BROWN, DAVID CARTER, REBECCA GAINES, JANICE JOHNSON, ELIZABETH KMIECIAK, CHAQUITTA MCCREARY, KATHERINE PAOLACCI, DAVID SLIVKA, DOMINIC TUMMINELLO, and INDIANA VOTE BY MAIL, INC., individually, and on behalf of those similarly situated, | ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| -vs- | ) ) | Case No. 1:20-cv-01271-JPH-DLP |
| PAUL OKESON, S. ANTHONY LONG, SUZANNAH WILSON OVERHOLT, and ZACHARY E. KLUTZ, in their official capacity as members of the Indiana Election Commission, and CONNIE LAWSON, in her official capacity as the Indiana Secretary of State, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
## PRELIMINARY INJUNCTION

Come Now Plaintiffs and the putative class, by counsel, and hereby file their

Memorandum of Law in support of their motion for preliminary injunction. [Filing No. 13.]

## 1.    INTRODUCTION

This is an action for declaratory and injunctive relief against Indiana election officials

who have failed to take necessary actions to protect Indiana voters. Due to this inaction, many

voters will have to make a choice between their personal safety and health, and exercising their

right to vote in the general election held on November 3, 2020. The individual Plaintiffs seek to

vote safely in the November general election, and to do so by casting an absentee ballot, by mail,

in precisely the same manner in which these same election officials have allowed in the June 2, 2020 primary election. Defendants could again direct that Indiana absentee ballot statutes, specifically Ind. Code § 3-11-10-24(a)(3) and (4), be broadly construed such that a voter who rightly fears contracting the highly infectious Coronavirus and the disease it causes, COVID-19, is a voter confined to his residence because of an illness or one "with disabilities" within the meaning of subsections (3) and/or (4).

But Defendants, although having done so in substance by allowing all voters to vote by mail in the June 2, 2020, primary election, have thus far failed to do the same for the November general election, despite the fact that the overwhelming consensus of scientists and medical professionals is that this deadly and highly transmissible virus will continue to be in our midst, wreaking havoc on our population and economy this fall. Because of Defendants' failure and/or refusal to act responsibly to protect Indiana voters' health and constitutional voting rights under the Fourteenth and Twenty-Sixth Amendments, they have left Plaintiffs with no choice but to beseech the judiciary to protect their constitutional rights to life and liberty, and right to vote in a free society.

## II.    STATEMENT OF FACTS

### A.    Plaintiffs

Plaintiffs are twelve (12) registered Indiana voters who have not reached the age of 65 and who are not otherwise entitled to vote by mail because they do not now and are not expected on Election Day to satisfy any of the categories of voters established by I.C. § 3-11-10-24(a) and thus be "entitled to vote by mail." [Filing No. 6, p. 6, ¶¶ 23, 24; Filing Nos. 13-1 – 13-12, ¶¶ 3, 4.[1]]

---

[1] Each of the individual Plaintiffs have executed a declaration, which were filed as exhibits to the Motion for Preliminary Injunction as follows: Declaration of Barbara Tully [Filing No. 13-1]; Declaration of David Carter [Filing No. 13-2]; Declaration of Elizabeth Kmieciak [Filing No. 13-3]; Declaration of Janice Johnson [Filing No. 13-4]; Declaration of Marc Black [Filing No.

Each has serious concerns about being left with no alternative but to show up in person in what are reasonably expected to be crowded public polling places this fall to exercise their right to vote in what many believe will be one of the most momentous elections in history. Some, such as Plaintiffs Barbara Tully, David Carter, Elizabeth Kmieciak, and Janice Johnson, although in good health, have rigorously followed the recommendations of public health officials to stay at home and practice social distancing. [Filing Nos. 13-1 – 13-4, ¶ 2.] Others, such as Plaintiff Marc Black, have compromised immune systems. [Filing No. 13-5, ¶ 2.] Others, such as Plaintiffs Katharine Black, Shelly Brown and Chaquitta McCreary, live with an immune- or physically-compromised spouse or child and fear infecting their family member or, in the case of Plaintiff Dominic Tumminello, his children and parents. [Filing No. 13-6 – 13-9, ¶ 2.] Others, such as Plaintiff Rebecca Gaines, have had COVID-19 and recovered, but fear contracting it again, as there is no scientific evidence that having had and recovered from the virus assures future immunity. [Filing No. 13-10, ¶ 2.] Still others, such as Plaintiff Katherine Paolacci, work at a public institution regularly encountering members of high-risk populations and fears contracting the virus and transmitting it to them. [Filing No. 13-11, ¶ 2.] And one, Plaintiff David Slivka, is a respiratory therapist who has seen first-hand the effects of the virus, knows how easily it is transmitted, and is acutely aware of the dangers of coming into contact with others who may be infected. [Filing No. 13-12, ¶ 2.] Each Plaintiff wishes to vote by mail but under current Indiana law is not entitled to do so. [Filing Nos. 13-1 – 13-12, ¶¶ 3, 4.]

---

13-5]; Declaration of Katharine Black [Filing No. 13-6]; Declaration of Shelly Brown [Filing No. 13-7]; Declaration of Chaquitta McCreary [Filing No. 13-8]; Declaration of Dominic Tumminello [Filing No. 13-9]; Declaration of Rebecca Gaines [Filing No. 13-10]; Declaration of Katherine Paolacci [Filing No. 13-11]; and Declaration of David Slivka [Filing No. 13-12].

### B.    Defendants

Defendants Paul Okeson, S. Anthony Long, Suzannah Wilson Overholt, and Zachary E. Klutz, are members of the Indiana Election Commission ("IEC"), which is charged with administering Indiana election laws. Ind. Code § 3-6-4.1-14 (a)(1). This includes adopting rules to "[g]overn the fair, legal, and orderly conduct of elections." *Id.* It also includes the power to adopt, by unanimous vote of its entire membership, temporary emergency rules "to implement a court order requiring [it]...to administer an election in a manner not authorized by this title," *id.* at -16, or in cases of a "natural disaster or other emergency." *Id.* at -17 (a). On March 25, 2020, the IEC suspended statutory restrictions on voting by mail by entering an emergency order that the words "voter with disabilities" in Ind. Code § 3-11-10-24(a)(4) shall be construed to include any "voter who is unable to complete their ballot because they are temporarily unable to physically touch or be in safe proximity to another person." IEC Order 2020-37, Section 9A. [Filing No. 6, p. 10, ¶ 44.] However, despite having met most recently on May 12, 2020, the IEC has failed to reach a bipartisan agreement to extend this interpretation for the November 3, 2020, general election.

 Defendant Lawson is the Indiana Secretary of State and in that capacity is the chief election official of the State. Ind. Code § 3-6-3.7-1. She is responsible for enforcing and implementing Indiana's election laws and her office routinely issues guidance to county election officials in each of Indiana's 92 counties on matters involving election administration.

### C.    Coronavirus and COVID-19

Jeffrey G. Jones, M.D., M.P.H., states that the "vast majority of Hoosiers are vulnerable" to COVID-19, a potentially fatal respiratory disease, which is "readily spread from person to person." [Declaration of Jeffery G. Jones, M.D., M.P.H. Filing No. 13-13, p. 9, ¶ 18.] COVID-19 is "highly likely" to be with us in November 2020, and the majority of Hoosiers will still be likely to be vulnerable to the disease. [*Id.*] In order to minimize the risk of the transmission,

people need to "spend the shortest amount of time in the best ventilated, least contaminated environment, where the fewest number of people are generating the fewest virus particles." [*Id.*, p. 4, ¶ 8.] People are anxious about contracting the disease, and due to these fears, may refrain from entering polling places, which are not assured of meeting the recommended ventilation standards. [*Id.*, p. 9, ¶ 18.].]

Gregory Shufeldt, Ph.D., notes that Hoosiers who wish to vote in the November election are "likely to face unprecedented impediments to casting a vote in person due to the continued transmission of COVID-19." [Declaration of Gregory Shufeldt, Ph.D., Filing No. 13-14, p. 11, ¶ 58.] Even under conservative estimates, there are least tens of thousands of Indiana voters who do not qualify under the current statutory entitlement to cast their vote by mail. [*Id.*, p. 10, ¶¶ 50-53.] Voters like Plaintiffs, who are not currently entitled to vote by mail, will have to choose between protecting their health and safety, and fulfilling their civic duty. [*Id.*, p. 12, ¶ 58.] Medical experts, including Anthony S. Fauci, M.D., an immunologist who is head of the National Institute of Allergy and Infectious Diseases, has stated that "[w]e *will* have coronavirus in the fall. I am convinced because of the degree of transmissibility that it has, the global nature. What happens with that will depend on how we're able to contain it when it occurs." [Filing No. 6, p. ¶ 5.] Additional facts will be discussed below.

## III.    PRELIMINARY INJUNCTION STANDARDS

 "A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. Centimark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015). "To survive the threshold phase, a party seeking a preliminary injunction must satisfy three requirements." *Valencia v. City of Springfield, Illinois*, 883 F.3d 959, 966 (7th Cir. 2018); *Planned Parenthood of Indiana, Inc. v. Commissioner*, 699 F.3d 962, 972 (7th Cir. 2012). To obtain a

preliminary injunction, a plaintiff must show (1) a reasonable likelihood of success on the merits, (2) the absence of an adequate remedy at law, and (3) a threat of irreparable harm without the injunction.  If the plaintiff makes this showing, the court weighs two additional factors: (4) the balance of harms—harm to the plaintiff if the injunction is erroneously denied versus harm to the defendant if the injunction is erroneously granted—and (5) the effect of the injunction on the public interest. *Planned Parenthood of Ind. & Ky., Inc. v. Adams*, 937 F.3d 973, 980 (7th Cir. 2019); *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11-12 (7th Cir. 1992). The higher the likelihood of success on the merits, the less decisively the balance of harms needs to tilt in the moving party's favor. This is known as the "sliding scale" approach. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008); *Abbott Laboratories*, 971 F.2d at 12. A reasonable likelihood of succeeding on the merits means a "greater than negligible chance of winning." *AM Gen. Corp. v. Daimlerchrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002); *C.Y. Wholesale v. Holcomb*, 2019 WL 74971350 (S.D. Ind. 2019).

Even a lesser likelihood of success, i.e., a "better than negligible" chance of winning, will suffice if the balance of harms tips heavily in plaintiffs' favor. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 897 (7th Cir. 2001). In performing this sliding-scale analysis, "the court bears in mind that the purpose of a preliminary injunction is 'to minimize the hardship to the parties pending the ultimate resolution of the lawsuit.'" *AM Gen. Corp*, 311 F.3d at 804 (quoting *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722, 726 (7th Cir. 1998)).

## A.      Evidentiary Considerations in Preliminary Injunction Proceedings

A court may grant a preliminary injunction based on less formal procedures and on less extensive evidence than required at a trial on the merits. For example, courts may rely on hearsay affidavits. *Goodman v. Ill. Dept. Of Financial and Professional Regulation*, 430 F.3d 432, 439 (7th Cir. 2005). In a proceeding for preliminary relief, such as a preliminary injunction, courts have

discretion to consider hearsay and various other normally-inadmissible materials, documents and statements because the Federal Rules of Evidence apply differently in a proceeding on a motion for a preliminary relief. *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395(1981) ("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits"); *Ty, Inc. v. GMA Accessories, Inc.,* 132 F.3d 1167, 1171 (7th Cir. 1997) (affidavit that would be inadmissible at trial could be considered in a summary proceeding such as a proceeding on a preliminary injunction motion); *S.E.C. v. Cherif,* 933 F.2d 403, 412 n.8 (7th Cir. 1991) (inadmissible hearsay can likewise be considered on a preliminary injunction). This is the reason findings and conclusions made in resolving a preliminary injunction motion are not binding on the merits. *Camenisch*, 451 U.S. at 395.

## IV.   ARGUMENT

### A.   Plaintiffs are likely to prevail on the merits.

1. Plaintiffs are likely to prevail on the merits of their Fourteenth Amendment challenge to Indiana's mail voting statute as applied during the pandemic.

Plaintiffs' Fourteenth Amendment equal protection claims are evaluated under the framework established by the Supreme Court in *Burdick v. Takushi,* 504 U.S. 428, 434 (1992), and *Anderson v. Celebrezze,* 460 U.S. 780, 788-89 (1983). "The Supreme Court in *Anderson* explicitly imported the analysis used in equal protection cases to evaluate voting rights challenges brought under the First Amendment, thus creating a single standard for evaluating challenges to voting restrictions." *Obama for America v. Husted*, 697 F.3d 423, 430 (6th Cir. 2012) (citations omitted). Under the *Anderson-Burdick* test, the Court must first consider "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments the plaintiff seeks to vindicate." *Burdick*, 504 U.S. at 434. The Court must then identify and evaluate the precise interests put forward as justifications for the burden imposed by the challenged election practice,

rule, or structure. *Id*. Finally, it must determine the legitimacy and strength of each of those interests and the extent to which those interests make it necessary to burden the Plaintiffs' rights. *Id*.

The *Anderson-Burdick* test is a flexible standard, grounded in the First and Fourteenth Amendments, that establishes the constitutional rules that apply to challenges to state election regulations. *Acevedo v. Cook Cty. Officers Electoral Bd.,* 925 F.3d 944, 948 (7th Cir. 2019). It replaces traditional equal protection analysis (tiers of scrutiny, suspect classifications, etc.), and depends on the severity of the burden imposed by the challenged election law. *Burdick,* 504 U.S. at 434; *see Harlan v. Scholz,* 866 F.3d 754, 759 (7th Cir. 2017). Where an election law imposes only "reasonable, nondiscriminatory restrictions upon the rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Id*. at 760. Laws that impose severe burdens on voters' rights must be narrowly drawn to advance a compelling state interest. *Id*. Most cases, however, fall in between the two extremes, including cases such as this one where it is alleged that an election law has burdened voting rights selectively and non-uniformly. *See, e.g., Common Cause of Indiana v. Marion Co. Elect. Bd.,* 311 F.Supp.2d 949, 968 (S.D. Ind. 2018). But even a *non*discriminatory law must be justified "by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Co. Election Board,* 553 U.S. 181,191 (2008) (quoting *Norman v. Reed,* 502 U.S. 279, 288-89 (1992)).

Under *Burdick's* "flexible standard" the Court compares the burden on voters with the governmental interest and the means it has chosen to advance that interest. *Harlan,* 866 F.3d at 760; *see also Obama for America,* 697 F.3d at 429. There is no "litmus test" to separate valid from invalid voting regulations, and courts must "make the 'hard judgments' that our adversary system demands." *Crawford,* 553 U.S. at 190. The question whether an election law or practice places an unacceptable or discriminatory burden on voters is "not a factual finding, but a legal

determination." *Harlan*, 866 F.3d at 760 (quoting *Ohio Democratic Party v. Husted*, 834 F.3d 620, 628 (6th Cir. 2016)). The *Anderson/Burdick* flexible test applies to *all* Fourteenth Amendment challenges to state election laws in this Circuit. *Acevedo*, 925 F.3d at 948; *see also Common Cause Indiana v. Indiana Election Commission*, 800 F.3d 913 (7th Cir. 2015) (in balancing the asserted injury to the plaintiff with the interests of the State, "the Court must not only determine the legitimacy and strength of those interests; it also must consider the extent to which those interests make it *necessary* to burden the plaintiff's rights," citing *Anderson*) (emphasis added)).

Plaintiffs do not claim that absentee voting is accorded full constitutional protection. They acknowledge that the State could likely eliminate all absentee voting if it wished. *McDonald v. Bd. of Elect. Comm'rs*, 394 U.S. 802, 810-11 (1969) (state restrictions on absentee voting as a general matter do not violate a fundamental constitutional right); *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004) (rejecting contention that the Fourteenth Amendment required Illinois to allow all registered voters a blanket right to vote by mail). But Indiana has chosen to grant an entitlement to certain voters to vote by mail. At present, Indiana, the nation, and indeed the entire world are in the grips of a global pandemic involving a highly transmissible virus which is expected by doctors, scientists, and epidemiologists to continue for many, many more months. This pandemic, as the U.S. Supreme Court recently emphasized, will continue to raise serious questions whether certain "modifications in election procedures in light of COVID–19 are appropriate." *Republican National Committee v. Democratic National Committee*, ___U.S. ___, 206 L. Ed 2d 452 (April 6, 2020).

Count I of Plaintiffs' Complaint raises an as-applied rather than a facial challenge to Indiana's vote-by-mail statute, and it is against the backdrop of this global pandemic that Plaintiffs' request for preliminary injunctive relief must be evaluated. COVID-19 is an abbreviation for the novel coronavirus disease of 2019, a respiratory illness that spreads easily

and sustainably in the community through respiratory droplets produced when an infected person coughs or sneezes. *See* Centers for Disease Control and Prevention Coronavirus Disease 2019 Frequently Asked Questions, https://www.cdc.gov/coronavirus/2019-ncov/faq.html#How-COVID-19-Spreads (last visited April 11, 2020). The novel coronavirus of 2019 is a serious disease, ranging from no symptoms or mild ones for people at low risk, to respiratory failure and death in older patients and patients with chronic underlying conditions. While it is thought that people are most contagious when symptoms are present, the virus has also been detected in asymptomatic persons. *See id*. The incubation period is believed to be up to fourteen days in duration. *Id*.

There is no vaccine to prevent COVID-19, nor is there antiviral medication that can definitively treat it. [*Id.*, *and see* Filing No 13-13, pp. 6-7, ¶ 13.] According to the CDC, "[t]he best way to prevent illness is to avoid being exposed to the virus." Centers for Disease Control and Prevention Coronavirus Disease 2019 Frequently Asked Questions, https://www.cdc.gov/coronavirus/2019-ncov/faq.html#How-COVID-19-Spreads (last visited April 11, 2020. The CDC recommends, among other things, that people clean their hands often or use hand sanitizer when soap is unavailable, avoid close contact with other people (at least six feet in distance), and clean and disinfect frequently touched surfaces daily, such as tables, doorknobs, light switches, and countertops. *Id.* The CDC also recommends that if an individual becomes sick, he or she should isolate from others by staying in a specific sick room and using a separate bathroom if possible. *Id.*

While it has been accepted that older adults are the most vulnerable, a March 18, 2020 CDC report noted that 38% of the 508 hospitalized patients were younger — between 20 and 54 years of age. *See* Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) United States, February 12 - March 16, 2020 (Mar. 18, 2020);

https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm. An April 8, 2020 CDC report

on hospitalization rates among COVID-19 patients notes that out of the 1,482 hospital patients

studied, 74.5% were aged 50 years or older and 54.4% were male. *See* Centers for Disease

Control, Morbidity and Mortality Weekly Report (April 8, 2020), Hospitalization Rates and

Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 -

COVID-NET, 14 States, March 1-30, 2020,

https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6915e3-H.pdf.

 The State of Indiana has long offered the option of voting by mail to voters to make

voting available to those for whom in-person voting would otherwise be "difficult or impossible."

*League of Woman Voters of Indiana v. Rokita*, 929 N.E.2d 758, 768 (Ind. 2010). However, it has

limited that entitlement to the categories of voters specified in I.C. § 3-11-10-24(a).[2] The

pandemic now makes the principal alternative to voting by mail -- in-person voting at public

polling locations -- both dangerous and difficult for Plaintiffs and indeed for all Indiana voters

who do not currently qualify under Indiana law to vote by mail.

 By creating a *statutory* entitlement to vote by mail for some but not all Indiana voters, the

equal protection guarantees of the Fourteenth Amendment are implicated. [3] Having granted

some of its citizens a categorical entitlement to vote by mail, thus extending a voting privilege or

convenience to some but not all voters, the State must administer that right evenhandedly in

---

[2] I. C. § 3-11-10-24(a) "entitles" thirteen (13) specific categories of voters, including voters who
are "elderly," have "disabilities," or are scheduled to work during the entire twelve hours the
polls are open, to vote by mail.

[3] Defendants waived compliance with the challenged statute for Indiana's primary election after
postponing it From May 5 to June 2, 2020. However, Defendants have thus far shown no
willingness to make a similar adjustment for the November 3, 2020, general election, when the
virus will with a reasonable degree of scientific certainty still be ravaging the nation. [*See*, e.g.,
Filing No. 13-13, p. 9, ¶ 18.]

order to comply with equal protection requirements. "Once a unit of government has decided to administer a benefit or impose a burden, it must do so rationally and equitably, without offense to independent constitutional prohibitions." *Common Cause of Indiana*, 311 F.Supp.3d at 965; *see also*, *Bush v. Gore,* 531 U.S. 98, 104-05 (2000) ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another"); *Dunn v. Blumstein,* 405 U.S. 330, 336 (1972) ("[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."); *Harper v. Va. Bd. of Elections,* 383 U.S. 663, 665 (1966) ("once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause"); *One Wisconsin Inst., Inc. v. Thomsen,* 198 F.Supp.3d 896, 933 (W.D. Wis. 2016) (rejecting argument that challenge to in-person absentee voting provisions did not implicate fundamental constitutional rights); *Martin v. Kemp*, 341 F.Supp.3d 1326, 1338 (N.D. Ga. 2018); *Saucedo v. Gardner,* 335 F.Supp.3d 202 (D.N.H. 2018) (holding that the privilege of voting by mail is deserving of constitutional protections); *Zessar v. Helander,* 2006 WL 642646, at *6 (N.D. Ill. 2006) *rev'd on other grounds* 536 F.3d 788 (7th Cir. 2008); *Doe v. Walker*, 746 F.Supp.2d 667, 681 (D. Md. 2010) ("where a state has authorized the use of absentee ballots, any restriction it imposes on the use of those absentee ballots which has the effect of severely burdening a group of voters must be narrowly tailored to further a compelling state interest."); and *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F.Supp. 1354, 1358 (D. Ariz. 1990) (absentee voting is subject to constitutional protections afforded by the Fourteenth Amendment).

To demonstrate a likelihood of success on the merits, it is not necessary for Plaintiffs to show that the challenged vote-by-mail structure absolutely prohibits certain voters from voting, only that Plaintiffs' ability to cast a ballot is impeded by the challenged practice or structure. Just six years after deciding *McDonald,* the Supreme Court limited *McDonald's* holding to its facts,

noting that "there was nothing in the record to indicate that the challenged Illinois statute had any impact on the appellants' exercise of their right to vote." *Hill v. Stone*, 429 U.S. 289, 300 n. 9 (1975); *see also O'Brien v. Skinner*, 409 U.S. 1240, 1241 (1972) (Marshall, J., in chambers) (the absence of proof precluded the *McDonald* plaintiffs from showing that the denial of absentee ballots was tantamount to a total deprivation of the franchise); and *Goosby v. Osser*, 409 U.S. 512, 520-22 (1973) (observing that in *McDonald* Court itself suggested a different result had plaintiffs shown that the lack of absentee voting had effectively precluded them from voting). The courts of appeal have also observed that *McDonald* was decided before the Supreme Court announced the *Anderson/Burdick/Crawford* flexible burden-shifting approach in lieu of the traditional three-tiered levels of review applied in ordinary equal protection cases. *Price v. New York St. Bd. of Elections*, 540 F.3d 101, 109 & n 9 (2nd Cir. 2008); *see also*, *Obama for America*, 697 F.3d at 430-31 (distinguishing *McDonald* and using *Burdick* balancing because plaintiffs had demonstrated the challenged Ohio law eliminating three days of early voting placed a burden on the right to vote that would preclude a significant number of voters from voting); and *Ohio St. Conf. NAACP v. Husted*, 768 F.3d 524, 541 (6th Cir. 2014), *vacated on other grounds* 2014 WL 10384647 (6th Cir. 2014) (holding that *McDonald* does not require proof that the challenged law absolutely precluded plaintiffs from voting, only that it would "impede" the exercise of the rights of a significant number of voters to exercise their franchise). The coronavirus pandemic is likely to impede in-person voting through the November 3, 2020, general election. [Filing No. 13-13, p. 9, ¶ 18; Filing No. 13-14, pp. 11-12, ¶ 58.]

The impact of the ongoing pandemic upon the *Anderson/Burdick/Crawford* balancing test applicable to a challenge to state election law governing mail ballots was recently discussed in *League of Woman Voters of Va. v. Va. St. Bd. of Elections*, Cause No. 6:20-cv-0024 (E.D. Va. May 5, 2020). The court (slip op. at 16), in approving a partial settlement agreement making

changes to certain provisions of Virginia's absentee balloting laws, stated that in "ordinary times, Virginia's witness signature requirement may not be a significant burden on the right to vote." However, at a time when all Americans have been instructed to practice social distancing due to the deadly and highly transmissible coronavirus, the signature requirement "will force a large class of Virginians to face the choice between adhering to guidance that is meant to protect not only their own health, but the health of those around them, and undertaking their fundamental right—and, indeed, their civic duty—to vote in an election. *The Constitution does not permit a state to force such a choice on its electorate,*" citing *Harper*, 383 U.S. at 670 (emphasis added). For other examples of court's taking into account the special circumstances of the COVID-19 pandemic in the election law context, *see Democratic Nat'l Comm. v. Bostelmann*, 2020 U.S. Dist. LEXIS 57918 at **12-13 (W.D. Wis. 2020); and *Garbett v. Herbert*, 2020 U.S. Dist. LEXIS 75853 (D. Utah 2020) (each granting preliminary injunctions after applying *Anderson/Burdick* balancing); *see also, Paher v. Cegavske*, 2020 U.S. Dist. LEXIS 76597 (D. Nev. 4/30/20) (rejecting request for preliminary injunction by plaintiffs opposing Nevada secretary of state's plan to implement an all-mail election to combat the spread of COVID-19, holding that the secretary's interests in protecting the health and safety of Nevada's voters and safeguarding the voting franchise in light of the COVID-19 pandemic far outweighed any burden on plaintiffs' right to vote, particularly one premised on a wholly speculative claim of voter fraud resulting in dilution of votes).

Only a state election law or structure that does not burden (or accord special voting privileges to) similarly situated voters is entitled to the lowest tier of constitutional review, i.e., rational basis. *Harlan*, 866 F.3d at 760. However, an election law that restricts the rights of some voters but not others similarly situated, or which "dole[s] out special voting privileges" is subject to heightened judicial scrutiny and must be justified by "precise" governmental interests that are "sufficiently weighty." *Crawford*, 553 U.S. at 190-91; *Obama for America*, 697 F.3d at 435-36 (Ohio

14

limitation on early in person absentee voting on all non-military voters held to violate equal protection, noting the lack of any relevant distinction between military and non-military voters). There is similarly no relevant distinction during this pandemic between Indiana voters who, by operation of I.C. § 3-11-10-24(a), are entitled to vote by mail, and those such as Plaintiffs who are not. All voters, regardless of age or station, but particularly those with compromised immune systems, pre-existing health conditions, or physically-compromised family members with whom they are in regular contact will find in-person voting during this pandemic just as dangerous and difficult, if not impossible, without unnecessarily putting their health and even their lives at risk.[4]

Defendants' failure to suspend the limitations on mail balloting and extend the operation of the vote-by-mail statute to all voters for the November 3, 2020, general election, as they previously did with respect to the delayed June 2, 2020 primary election, will impede and abridge the exercise of a voting right by granting to some Indiana voters, but not to Plaintiffs and others similarly situated, the right to vote by mail, even though the pandemic makes voting in person at typically crowded public polling places potentially life-threatening. These impediments impose more than a slight burden on the right to vote. Thus, Defendants should be required to put forth the "precise interests" in justification of their failure and/or refusal to extend no-excuse mail voting to all voting for the November 3, 2020, general election. *Crawford*, 553 U.S. at 203 (quoting *Burdick*, 504 U.S. at 434). This Court must not only determine the legitimacy and strength of each interest the Defendants put forth for their failure to act, *Anderson*, 460 U.S. at

---

[4] As many as 40 Wisconsin voters and election workers who were recently required to choose between voting and their health were later found to have contracted the virus through activities relating to the April 7 election. https://talkingpointsmemo.com/news/wisconsin-covid-40-election (last visited April 27, 2020); https://www.wuwm.com/post/40-coronavirus-cases-milwaukee-county-linked-wisconsin-election-health-official-says#stream/0 (last visited April 27, 2020).

789, it must also "consider "the extent to which those interests make it necessary to burden [Plaintiffs'] rights."" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789); *see also*, *Obama for America*, 697 F.3d at 430 (when a state regulation is found to treat voters differently in a way that burdens the fundamental right to vote, the *Anderson-Burdick* standard applies); and *One Wisconsin Inst., Inc.,* 198 F.Supp.3d at 931-35.

Defendants cannot put forth precise interests that are sufficiently weighty to justify the burden imposed on Plaintiffs' voting rights by withholding from them during the pandemic an entitlement extended to other voters, *Crawford,* 553 U.S. at 190-91; an entitlement they willingly extended to all voters for the primary election but not for the general election. On April 16, 2020, during a press conference, both Defendant Lawson and Gov. Eric Holcomb rejected allegations that voting by mail is ripe for fraud. "We've long been voting by mail. I have a high level of confidence in the integrity of our election process," Holcomb said. "We'll have a safe and secure election." https://www.nwitimes.com/news/local/govt-and-politics/indiana-primary-election-to-feature-mail-in-and-in-person-voting/article_fce4d801-a81e-567a-8f75-46cf7db1fd28.html

    2.    Plaintiffs are also likely to succeed on the merits of their facial Twenty-Sixth Amendment challenge to Indiana's mail voting statute.

Plaintiffs contend in Count II of the Amended Complaint that Ind. Code § 3-11-10-24(a) on its face also violates the Twenty-Sixth Amendment to the United State Constitution. That amendment provides that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any state on account of age." [Filing No. 6, pp. 18-20.] The amendment protects *all* citizens over the age of 18 (not just those ages 18, 19, and 20) from denial or abridgement of the right to vote *on account of their age*. Indiana could not explicitly entitle only white voters to vote by mail without facially

violating the Fifteenth Amendment's prohibition of denial or abridgement of the right to vote

"on account of race." It could not expressly entitle only women voters to vote by mail without

facially violating the Nineteenth Amendment's prohibition of denial or abridgement of the right

to vote "on account of sex." For the same reasons, Indiana may not entitle only "elderly" voters

(defined by I.C. § 3-5-2-16.5 as voters age 65 and over), without facially violating the Twenty-

Sixth Amendment's prohibition of denial or abridgement of the right to vote of voters age 18 and

older "on account of age."

The right to vote is foundational in our democratic system, *Kramer v. Union Free Sch. Dist.*

*No. 15*, 395 U.S. 621, 626 (1969); *Harper*, 383 U.S. at 667; *Reynolds v. Sims*, 377 U.S. 533, 555

(1964); thus, any suggestion that the Twenty-Sixth Amendment should be read narrowly must be

viewed with skepticism. Because protecting the franchise is "preservative of all rights," and the

opportunity to participate in the formation of government policies defines and enforces all other

entitlements, *Yick Wo v. Hopkins*, 118 U.S. 356, 370(1886), constitutional amendments that protect

the right to vote, such as the Fifteenth, Nineteenth and Twenty-Sixth, must be read literally to

strike down state enactments that on their face discriminate on account of race, sex, or age. The

text of the Twenty-Sixth Amendment states broadly that the right "to vote" shall not be abridged

or denied; it does not qualify or restrict the meaning of "vote" in any way.

Nor does the text of the Twenty-Sixth Amendment particularize its protections for a

specific group of voters by age, such as youth, students, or military personnel; instead it simply

provides broad and unqualified protections from age-based denial or abridgement of the right to

vote for all citizens over the age of eighteen. Thus, the Twenty-Sixth Amendment's protections

on their face do not only apply to the newly-enfranchised class of voters between the ages of 18–

21. The textual similarities between the Twenty-Sixth Amendment and the Fifteenth and

Nineteenth Amendments is instructive. For example, while the Nineteenth Amendment was born

out of the suffragist movement, it is not so narrow as to confer the franchise only upon women, but broadly prohibits denial or abridgement of the right to vote "on account of sex," just as the Twenty-Sixth Amendment prohibits the denial or abridgement[5] of the right to vote of all citizens "on account of age."

Though the Twenty-Sixth Amendment bears many textual similarities to the Fifteenth and Nineteenth Amendments, there is a paucity of case law regarding the standard to be used in deciding Twenty-Sixth Amendment claims. *Nashville Student Org. Comm. v. Hargett*, 155 F.Supp.3d 749, 757 (M.D. Tenn. 2015); *One Wisconsin Inst., Inc.,* 198 F.Supp.3d at 925-26 (acknowledging the lack of clarity on what standard of review to apply but applying a Fifteenth Amendment intentional discrimination analysis to Twenty-Sixth Amendment claims due to the textual similarities of the amendments, and suggesting that doing so provides added protection to younger voters compared to a Fourteenth Amendment undue burden analysis); *N.C. State Conference of the NAACP v. McCrory*, 182 F.Supp.3d 320, 522 (M.D.N.C. 2016) *rev'd on other grounds*, 831 F.3d 204 (4th Cir. 2016) (expressing doubt that Fifteenth Amendment principles regarding intentional discrimination are applicable to the Twenty-Sixth Amendment, but doing so anyway based on the plaintiffs' theories of the case); and *Lee v. Va. State Bd. of Elections*, 843 F.3d 592 (4th Cir. 2016) (same).

One recent decision, *League of Woman Voters of Fla. v. Detzner*, 314 F.Supp.3d 1205, 1221 (N.D. Fla. 2018), despite this uncertainty notes that an "emerging consensus" points to the application of the intentional discrimination standard of *Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 US. 252 (1977), as the "appropriate framework" because applying *Anderson/Burdick*

---

[5] The core meaning of "abridge" is "shorten," and it necessitates a comparison. *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 333-34 (2000) (citing Webster's New International Dictionary 7 (2d ed. 1950); American Heritage Dictionary 6 (3d ed. 1992)).

"contributes no added protection to that already offered by the Fourteenth Amendment,"

(quoting *One Wisconsin Inst., Inc.,* 198 F.Supp.3d at 926). In *Detzner* a statute allowed for the

placement of early voting sites in various locations, including convention centers and community

centers. However, the defendant secretary of state interpreted the statute to categorically exclude

facilities related to colleges and universities, even those akin to convention centers and

community centers. *Detzner* thus involved a facially discriminatory law where a protected group

was overtly and categorically singled out. And where a law discriminates categorically and

facially, proof of discriminatory animus is not required. *See, e.g., Int'l Union, United Auto. Aerospace &*

*Agric. Implement Workers of Am. v. Johnson Controls, Inc.,* 499 U.S. 187, 199 (1991) (a plaintiff need not

prove discriminatory animus to make out a case of intentional discrimination where the

prohibited discrimination is facial); *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir.

1995) (a plaintiff makes out a prima facie case of intentional discrimination merely by showing

that a protected group has been subjected to explicitly differential treatment). Similarly, voting

qualifications that, by their very terms, draw distinctions based on prohibited characteristics are

prohibited by both the Fourteenth, *Nixon v. Herndon*, 273 U.S. 536, 541 (1927), and Fifteenth

Amendments. *South Carolina v. Katzenbach*, 383 U.S. 301, 325 (1966). A law that is discriminatory

"on its face is subject to strict scrutiny regardless of the government's benign motive." *Reed v.*

*Town of Gilbert*, 135 S. Ct. 2218, 2228 (2015); *see also Lynch v. Donnelly*, 465 U.S. 668, 687 n.13

(1984) (the Supreme Court "require[s] strict scrutiny of a statute or practice patently

discriminatory on its face"); *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003) (explicit "racial

classifications imposed by government must be analyzed by a reviewing court under strict

scrutiny") (quotation marks omitted).

Just as Indiana could not explicitly entitle only white voters to vote by mail without

violating the Fifteenth Amendment, or expressly entitle only women voters to vote by mail

without violating the Nineteenth Amendment, neither may it entitle only "elderly" voters to vote by mail without facially violating the Twenty-Sixth Amendment. Because the challenged Indiana statute on its face discriminates "on account of age" by conferring a categorical entitlement to vote by mail on those ages 65 and over but not voters under the age of 65, it violates the Twenty-Sixth Amendment's prohibition against the denial or abridgement of the right to vote on account of age.[6]

For the foregoing reasons, Plaintiffs are likely to prevail on the merits of their federal claims.

### B.      Plaintiffs have no adequate legal remedy.

An injury is irreparable only if it cannot be undone through monetary remedies. The denial or abridgement of the right to vote is without redress; there is simply no way to recompense violations of this fundamental right after the fact. *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *accord Obama for America.,* 697 F.3d at 436; *see also Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986); *Dillard v. Crenshaw Cty.,* 640 F.Supp. 1347, 1363 (M.D. Ala. 1986) (an infringement of the right to vote cannot be remedied through monetary damages). No such damages remedy is sought or possible here, and if Plaintiffs are denied the right to safely vote by mail in the November 3, 2020, general election, they will have lost that right forever without legal recourse.

---

[6] Regardless of the constitutional grounds on which the Court decides to declare the challenged vote by mail statutes unlawful, the Court should order Defendants to extend the entitlement to vote by mail to all qualified voters for the 2020 general election and beyond, rather than withdrawing the benefits of voting by mail from the already-entitled categories of voters, which is the preferred rule in the typical case. *Sessions v. Morales-Santana,* 198 L. Ed 2d 150, 175 (2017); *Heckler v. Mathews,* 465 U.S. 728, 740 (1984); *Califano v. Westcott,* 443 U.S. 76, 89-90 (1979).

### C.   Plaintiffs will suffer irreparable harm to their right to equally participate in the electoral system.

Having demonstrated a strong likelihood of success on the merits of their federal constitutional claims and the lack of an adequate legal remedy, Plaintiffs must next demonstrate irreparable harm. For some kinds of constitutional violations, irreparable harm is presumed. *Ezell v. City of Chicago,* 651 F.3d 684, 699 (7th Cir. 2011). This presumption applies with equal protection violations. *Baskin v. Bogan,* 983 F.Supp.2d 1021, 1028 (S.D. Ind. 2014), *aff'd* F.3d 766 F.3d 648 (7th Cir. 2014), *cert. denied* 135 S. Ct. 316 (2014). It is well established that "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Campbell v. Miller,* 373 F.3d 834, 840 (7th Cir. 2004) (internal quotation marks and citation omitted); *Planned Parenthood of IN & KY v. Comm'r IN Dept. of Health,* 258 F.Supp.3d 929, 954-55 (S,D. Ind. 2017); *Mich. State A. Philip Randolph Instit. v. Johnson,* 833 F.3d 656, 669 (6th Cir. 2016) ("A restriction on the fundamental right to vote therefore constitutes irreparable injury."); *Montano v. Suffolk Cty. Legislature,* 268 F.Supp.2d 243, 260 (E.D.N.Y. 2003) ("An abridgement or dilution of the right to vote constitutes irreparable harm").

But even were this Court to conclude that Plaintiffs have not suffered a constitutional injury from which irreparable harm may be inferred, the Court is required to consider the irreparable harm issue in the context of the coronavirus pandemic, *supra,* at Sec. IV(A)(1), pp. 9-10. The harm they fear if they are required to vote in person at a public polling location is anything but speculative in the present and future circumstances.

A remedy for unsafe, life-threatening conditions "need not await a tragic event." *Helling v. McKinney,* 509 U.S. 25, 33 (1993). Forcing voters to choose between exercising the most precious right in a democracy and exposure to a highly transmissible virus that poses a real and immediate threat of serious health consequences or even death is not a choice the Constitution permits. and

is more than adequate to establish irreparable harm required for preliminary injunctive relief. Irreparable harm exists where the parties seeking a preliminary injunction "face imminent risk to their health, safety, and lives."[7] *Coronel v. Decker*, 2020 U.S. Dist. LEXIS 53954 *7 (S.D. N.Y. 2020) (citing *Henrietta D. v. Giuliani*, 119 F.Supp.2d 181, 214 (E.D.N.Y. 2000), *aff'd sub nom. Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003)), holding that due to their serious underlying medical conditions, civil immigration detainees faced a risk of severe, irreparable harm of contracting COVID-19.

If prison and immigration authorities may not constitutionally ignore a condition of confinement that is likely to cause serious illness and needless suffering weeks or months or even a year later, the Fourteenth Amendment must be deemed to impose a similar duty on election officials to offer an alternative to voters exposing themselves to a highly transmissible infectious disease at a public polling location, even though not all voters who vote in-person may become ill. Plaintiffs' burden does not require them to show that they inevitably will be infected by the virus if they are required to vote in person, only that the dangerous conditions and the possibility of harm they will face if required to vote in person are real and likely to persist through the general election. *See Hutto v. Finney*, 437 U.S. 678, 682 (1978) (noting that even though it was not alleged that the likely harm would occur immediately and although the possible infection might not affect all those exposed, a prison inmate was not required to wait for an attack of dysentery before seeking equitable relief against exposure to unsafe conditions).

---

[7] In *Helling*, the health risk was to environmental tobacco smoke. Recently, federal courts have rejected the government's claims that the risk of infection by the coronavirus is too speculative to meet the irreparable harm requirement for injunctive relief. *See*, e.g., *Cristian A.R. v. Decker*, 2020 U.S. Dist. LEXIS 66658 (D.N.J. April 12, 2020); *Fofana v. Albence*, 2020 U.S. Dist. LEXIS 65941 (E.D. Mich. April 15, 2020).

This Court should reject any argument that the risk of harm to these Plaintiffs during this pandemic is either too remote or speculative to establish the requisite irreparable harm to their fundamental right to vote.

**D.      The balance of harms favors the issuance of injunctive relief.**

While the harm to Plaintiffs from the *denial* of an injunction is concrete, substantial, and irreparable, the harm to the Defendants, if any, by *granting* an injunction is not. As previously noted, the Defendants have already waived the excuse requirement for the primary election in the face of the pandemic. They are, therefore, hard-pressed to claim that not doing so for the general election will cause them greater harm than the harm denying injunctive relief would cause to the Plaintiffs.

Moreover, a mandatory preliminary injunction is appropriate where the harm is substantial and maintaining the status quo would mean further harm and possibly make a final determination on the merits futile. *Ferry-Morse Seed. Co. v. Food Corp., Inc.* 729 F.2d 589, 593 (8th Cir. 1984) (citing cases). There is precious little time left between now and the general election, and election officials need to know at the earliest possible time what the rules will be, so they may prepare, order adequate supplies from vendors, and implement broader no-excuse absentee voting by mail.

Lastly, although the Seventh Circuit has "warned . . . against federal judicial micromanagement of state regulation of elections," *Stevo v. Keith*, 546 F.3d 405, 409 (7th Cir. 2008) (citing *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 954 (7th Cir. 2007)), it has also made clear that a district court has broad equitable authority to fashion appropriate relief when a state election law violates the Constitution:

> [T]he district court has the power to order the state to take steps to bring its election procedures into compliance with rights guaranteed by the federal Constitution, even if the order requires the state to disregard provisions of state law that otherwise might ordinarily

apply to cause delay or prevent action entirely. . . . To the extent that Illinois law makes compliance with a provision of the federal Constitution difficult or impossible, it is Illinois law that must yield.

*Judge v. Quinn*, 624 F.3d 352, 355-56 (7th Cir. 2010).

    **E.**    **The public interest will be served by the entry of a preliminary injunction granting the right to vote by mail to all qualified voters.**

Finally, the public interest is served by a preliminary injunction mandating that Defendants extend the right to vote by mail to Plaintiffs and all qualified voters to the November 3, 2020, general election. The public has a strong interest in preventing the rapid spread of COVID-19, whether in prisons, immigration detention facilities, or public polling sites, so as to avoid placing further strain on an already taxed healthcare system. *Thakker v. Doll*, 2020 U.S. Dist. LEXIS 59459, at *27 (M.D. Pa. 2020) ("Efforts to stop the spread of COVID-19 and promote public health are clearly in the public's best interest."); *Coronel v. Decker*, 2020 U.S. Dist. LEXIS 53954 (S.D. N.Y. 2020).

 Moreover, injunctions protecting constitutional freedoms are always in the public interest, *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006), and "the public has a strong interest in exercising the fundamental political right to vote." *Purcell v.* Gonzalez, 549 U.S. 1, 4 (2006). Because Plaintiff's proposed preliminary injunction would "eliminate[ ] a risk of individual disenfranchisement without creating any new substantial threats to the integrity of the election process," it is in the public interest and the Court should grant it. *U.S. Student Assoc. Found v. Land*, 546 F.3d 373, 388-89 (6th Cir. 2008).

Lastly, it is important for this Court to make a decision about absentee voting for the November general election. Delay may mean supplies become scarce to accommodate unprecedented increases in mail voting, thus forcing voters to show up in person and risk their health and even their lives, or not vote at all.

(https://www.npr.org/2020/05/03/848347895/ballot-printers-increase-capacity-to-prepare-for-mail-voting-surge

**F.      The Injunction Should be Issued Without Bond.**

Finally, Rule 65(c) of the Federal Rules of Civil Procedure states that no preliminary injunction should issue except until security is given in an amount deemed proper by the Court. However, the amount of security, and whether it should be required at all, rests in the sound discretion of the trial court. *Sherr v. Volpe,* 466 F.2d 1027, 1035 (7th Cir. 1972). Thus, despite the language of the federal rule, appropriate circumstances excuse the issuance of a preliminary injunction without a bond. *See, e.g., Wayne Chemical, Inc. v. Columbus Agency Serv. Corp.,* 567 F.2d 692, 701 (7th Cir. 1977). In determining whether a bond should be required, courts look to the possible loss to the enjoined party; the hardship a bond would impose on the applicant; and the impact of a bond on the enforcement of federal rights. *See Smith v. Bd. of Election Comm'rs for the City of Chicago,* 591 F.Supp.70, 72 (N.D. Ill. 1984) (citing *Crowley v. Local No. 82,* 679 F.3d 978, 1000 (1st Cir. 1982).

Plaintiffs challenge an Indiana law which they assert violates the Equal Protection Clause of the Fourteenth Amendment during the pandemic, because it discriminates by entitling some but not all voters to vote by mail, when social distancing is being practiced in order to slow the transmission of this deadly and highly-infectious virus. By permitting more voters to vote by mail and to eschew in-person voting, the injunction Plaintiffs seek would benefit both public health and participation rates in the civic duty of voting. To require a bond in this case would condition the exercise of plaintiff's right to vote safely during this national health emergency. Courts have regularly dispensed with the bond requirement under similar circumstances. *See Common Cause IN v. Lawson,* 327 F.Supp.3d 1139, 1156 (S.D. Ind. 2018) (no bond required where issuance of a preliminary injunction will not impose any monetary injuries on defendants). Here, even though

there may be some costs, permitting more voters to vote by mail will save money because paper-based voting is less expensive than the use of machines, and will, additionally, provide a paper trail in the majority of Indiana counties that use paperless voting machines, enhancing public confidence in the accuracy of the count. [Filing No. 13-14, pp. 7-8, ¶¶ 35, 36; *see also, Bontrager v. Indiana FSSA,* 829 F.Supp.2d 688, 705 (N.D. Ind. 2011); *K.G. ex rel. Garrido v. Dudek,* 839 F.Supp.2d 1106, 1123 (N.D. Cal. 2009).] No bond should be required here.

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their request for a preliminary injunction, enjoin Defendants from enforcing the requirements of I.C. § 3-11-10-24(a) in connection with the November 3, 2020, general election, and order that Defendants instruct all county election boards that all voters must be allowed to apply for and receive an absentee ballot without regard to their age and without excuse, and be permitted to vote by mail, in the November 3, 2020, general election.

Respectfully submitted,


*s/ William R. Groth*
William R. Groth
MACEY SWANSON LLP
445 N. Pennsylvania St., Suite 401
Indianapolis, IN  46204
Tel: (317) 637-2345, Ext. 132
E-mail: WGroth@fdgtlaborlaw.com


*s/ Mark W. Sniderman*
Mark W. Sniderman
FINDLING PARK CONYERS
 WOODY & SNIDERMAN, P.C.
151 N. Delaware Street, Ste. 1520
Indianapolis, IN  46204
Tel: (317) 231-1100
E-mail: msniderman@findlingpark.com