UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BARBARA TULLY, KATHERINE BLACK, MARK BLACK, SHELLY BROWN, DAVID CARTER, REBECCA GAINES, JANICE JOHNSON, ELIZABETH KMIECIAK, CHAQUITTA MCCLEARY, KATHERINE PAOLACCI, DAVID SLIVKA, DOMINIC TUMMINELLO, and INDIANA VOTE BY MAIL, INC., individually, and on behalf of those similarly situated | ) ) ) ) ) ) ) ) ) ) ) | Case No.: 1:20-cv-01271-JPH-DLP |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| PAUL OKESON, S. ANTHONY LONG, SUZANNAH WILSON OVERHOLT, and ZACHARY E. KLUTZ, in their official capacity as members of the Indiana Election Commission, and CONNIE LAWSON, in her official capacity as the Indiana Secretary of State; | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) ) | |

---

**RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

---

Plaintiffs ask for a preliminary injunction that would invalidate the absentee-ballot requirements set forth in Indiana Code § 3-11-10-24(a) and would require the State to allow anyone to vote absentee for *any reason* in the November 3, 2020, general election. Plaintiffs' argument, in other words, is "that the Constitution requires

all states to allow unlimited absentee voting, and the argument ignores a host of serious objections to judicially legislating so radical a reform in the name of the Constitution." *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004).

Indeed, the Fifth Circuit recently rejected claims materially identical to the Fourteenth and Twenty-Sixth Amendment claims Plaintiffs advance here. *See Texas Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020). And rightly so: The Supreme Court has long held that the Constitution neither grants a right to vote absentee nor obligates States to design their elections laws to ensure all citizens—including those for whom voting "may be extremely difficult, if not practically impossible"—are able to vote. *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 807–09 & n.8 (1969) (applying rational basis scrutiny, rather than strict scrutiny, to an Illinois law that limited who could vote absentee because it was "not the right to vote that is at stake here but a claimed right to receive absentee ballots"); *see also Texas Democratic Party*, 961 F.3d at 403, 408 (explaining that *McDonald* "squarely governs the equal-protection issue" and "applies equally to the Twenty-Sixth Amendment claim"). This case law precludes courts from "allow[ing] a political question—whether a rule is beneficial, on balance—to be treated as a constitutional question and resolved by the courts rather than by legislators." *Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020). Plaintiffs' preliminary injunction motion should therefore be denied.

## BACKGROUND

1.      Indiana uses a variety of voting methods to ensure Hoosiers can exercise their right to vote, and that elections are reasonably secure from fraud. Indiana al-

lows residents to vote in person both on Election Day and within 28 days prior (sometimes called "absentee in-person" voting), and to vote absentee by mail before Election Day. Through in-person voting, voters are able to vote in private and ensure accuracy of their voting. Absentee-by-mail voting introduces potential hurdles and difficulties in accurate voting as well as a greater potential for fraud.

Accordingly, Indiana has imposed limitations on absentee-voting to limit the problems inevitably posed by this method of balloting—problems that courts have consistently recognized. In rejecting a challenge to Illinois's absentee-ballot law, the Seventh Circuit noted the "host of serious objections to judicially legislating" no-excuse absentee voting. *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004).

First, "[v]oting fraud is a serious problem in U.S. elections generally and . . . is facilitated by absentee voting." *Id.* at 1130–31 (collecting sources); *see also Prigmore v. Renfro*, 356 F. Supp. 427, 432 (N.D. Ala. 1972), *aff'd*, 410 U.S. 919 (1973) (finding Alabama's limitations on absentee-voting were "reasonably related to protection against fraud in the voting of absentee ballots"). Voting by mail introduces the potential of fraudulent voting, including through coercion that would not exist in the presence of election officials.  That is why Indiana not only restricts who may *cast* an absentee-by-mail ballot, but also who may handle that ballot. *See* Ind. Code § 3-14-2-16(9)–(10); s*ee also Pabey v. Pastrick*, 816 N.E.2d 1138, 1149 (Ind. 2004) (invalidating mayoral election in light of pervasive fraud attendant to handling of absentee-by-mail ballots).

Absentee voters also are more prone to cast invalid ballots than voters who, being present at the polling place, may be able to get assistance from the election judges if they have a problem with the ballot. *Griffin* at 1131. Voting in person ensures casting the accurate vote the voter casts. A voter may incorrectly mark more than the maximum allowed – invalidating the vote, a mistake easily avoided by voting in person. Voting by mail has proven to pose additional problems such as delayed delivery of the ballots causing voters to submit duplicate ballots or delayed delivery after the deadline causing voter's vote to be discounted. [Dkt. 53-1 at ¶¶ 8-9, Dkt. 53-2 at 5-6, Dkt. 53-3 at ¶¶ 9–10.] To ensure voter confidence in absentee voting, the infrastructure must be thoroughly developed before it is implemented to ensure it is viable and the implications are understood and addressed.

2. On March 6, 2020, Indiana Governor Eric Holcomb declared a public health emergency for the novel coronavirus disease outbreak. [Dkt. 53-5 at 1.] Shortly thereafter, on March 20, 2020, Governor Holcomb exercised his public health emergency authority under Ind. Code § 10-14-3 to postpone the primary election, normally held on the first Tuesday of May, to June 2, 2020. [Dkt. 53-6.] On March 23, 2020, Governor Holcomb issued his directive for Hoosiers to Stay at Home, ordering Indiana residents to stay in their place of residence and prohibiting public or private gatherings of more than ten people, except for essential activities, essential governmental functions, or participating in essential businesses. [Dkt. 53-7.]

Following these orders, the Indiana Election Commission issued an emergency order, Order 2020-37, on March 25, 2020, moving the primary election date to June

2, 2020. [Dkt. 53-8.] And, noting that Indiana law "permits the Commission, in an emergency, to allow a person who is otherwise qualified to vote in person the ability to vote by absentee ballot," *id.* (citing Ind. Code § 3-11-4-1(c)), this Order further provided that "[a]ll registered and qualified Indiana voters are afforded the opportunity to vote no-excuse absentee by mail" for the primary election. [Dkt. 53-8.] As a result of the IEC's Order 2020-37, all 92 counties in Indiana permitted voters to vote by mail, in addition to in-person voting, for the primary election on June 2, 2020.

In allowing no-excuse absentee-by-mail voting, many counties experienced challenges processing the larger-than-usual volume of absentee ballots—challenges that would not have arisen if the election had used the normal voting rules that generally require in-person voting. Local counties incurred unintended costs in hiring personnel to process and count the mail-in votes, in postages to mail out the ballots, and to install safety measures to securely store the absentee ballots. [Dkt. 53-2 at ¶¶ 4–5, 10.] In addition, numerous absentee-by-mail ballots were not counted due to human error that could easily be avoided by the electronic machines: many voters forgot to sign their ballots, and sometimes election officials failed to initial the ballot before sending it to the voter. [Dkt. 53-2 at ¶ 11.] And, of course, the United State Postal Service's notorious unpredictability caused many ballots to arrive late to the voter and to be returned after the deadline to be counted. [Dkt. 53-1 at ¶ 8, Dkt. 53-2 at ¶ 5, Dkt. 53-3 at ¶ 9.]

If no-excuse absentee-by-mail voting is permitted for the general election in November, these problems would be far larger due to far greater voter participation.

3.     Indiana election officials are taking extraordinary precautions to protect voters from the COVID-19 pandemic. Before the primary election, the Secretary of State spent more than $1 million on media campaigns promoting voter awareness and participation before the 2020 primary election. [Dkt. 53-4 at ¶ 5]. Indiana also received $8 million in federal CARES Act funding to support safe 2020 elections. [Dkt. 53-4 at ¶ 4]. With the help of the Indiana National Guard, the Secretary of State procured and distributed personal protective equipment (PPE), including face masks, gloves, face shields, sneeze guards, hand sanitizer, and surface and equipment disinfectant, to all 92 counties to be used during the 2020 primary election. [Dkt. 53-4 at ¶ 7].

Of the $8 million received in CARES Act funding, $4.5 million remains available to fund safety efforts in the 2020 general election. [Dkt. 53-4 at ¶ 4.] The Secretary of State will again, with the assistance of the Indiana National Guard, procure and distribute over 1 million face masks, over 1.5 million gloves, 20,000 half-gallon bottles of hand sanitizer, 5,000 gallons of surface and equipment disinfectant, and other PPE supplies for voters and for poll workers. [Dkt. 53-4 at ¶ 8.] According to research done by an independent accounting firm, the amount of PPE the Secretary of State will procure should be sufficient to protect every poll worker throughout the state and up to 2 million in-person voters. [Dkt. 53-4 at ¶ 8.] Furthermore, the Secretary of State maintains an inventory of surplus PPE and will have the financial ability to procure and distribute additional PPE on an as-needed basis. [Dkt. 53-4 at ¶ 8.]

The Secretary of State plans to spend an additional $1 million on media campaigns promoting voter awareness and participation before the 2020 general election. [Dkt. 53-4 at ¶ 6.] The Secretary of State also plans to provide all precincts with a manual on best safety practices for voters and poll workers based on CDC guidelines, posters on pandemic safety precautions, and social distancing markers to be used in the 2020 general election. [Dkt. 53-4 at ¶ 9.]

4. The ample precautionary measures being taken by Defendants and other Indiana election officials are above and beyond the precautionary measures Plaintiffs themselves claim they take when they leave their homes. Plaintiffs have stated that the precautionary measures they take upon leaving their homes includes wearing masks and observing social distancing. [Dkt. 53-9 at 5-11.] Plaintiffs have deemed that those precautionary measures are reasonable, both in necessary outings (such as for shopping for groceries), and clearly unnecessary outings, such as multiple trips to the hair salon/barber [Dkt. 53-9 at 5, 9], frequent casual dining at restaurants [Dkt. 53-9 at 5–7, 10], in-person socializing with friends [Dkt. 53-9 at 5, 9, 11], in-person socializing with family [Dkt. 53-9 at 8, 9, 11], attending yoga classes [Dkt. 53-9 at 5, 6], going out for drinks [Dkt. 53-9 at 5, 9], going to the hardware store [Dkt. 53-9 at 6, 7, 10], staying in a hotel [Dkt. 53-9 at 6], traveling interstate by plane [Dkt. 53-9 at 6], attending large family gatherings of thirteen people [Dkt. 53-9 at 6], going to the personal trainer [Dkt. 53-9 at 7], going to the gym [Dkt. 53-9 at 7, 9], going to the dentist [Dkt. 53-9 at 7], meeting with investors [Dkt. 53-9 at 7], and attending rallies and demonstrations. [Dkt. 53-9 at 8, 11.]

Despite Plaintiffs' position that casting their votes in person is so dangerous it threatens their right to vote, some Plaintiffs went to voting sites in person for the June 2020 primary elections, despite having the option to vote by mail visiting voting sites [Dkt. 53-9 at 5, 11.] Plaintiffs' position that they are unable to cast their votes in person due to the dangers presented by COVID-19 are undermined by the frequency that they have ventured out of their homes for unnecessary purposes. Plaintiffs' reliance on wearing masks and social distancing as sufficient precautionary measures against COVID-19 when going out for drinks, visiting with friends, and going to the gym, undermines their arguments that they will feel unsafe attending the polls in-person for the November 2020 general election. The methods Plaintiffs utilized to avoid the spread of COVID-19 are measures they are able to take when voting in person in the November 2020 general election, in *addition* to the aforementioned precautionary measures Defendants and the State are taking to further mitigate the risks posed by COVID-19.

## LEGAL STANDARD FOR PRELIMINARY INJUNCTIONS

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear* showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129–130 (2d ed.1995) (emphasis added by *Mazurek* court).

To obtain a preliminary injunction, a party must show that it: (1) has a reasonable likelihood of success on the merits; (2) lacks an adequate remedy at law; and (3)

will suffer irreparable harm if the preliminary injunction is not awarded. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). *See also Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). In *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) the Seventh Circuit has also weighed whether the public interest would be served by entering the preliminary injunction.

When evaluating whether a preliminary injunction is appropriate, "[i]t is not enough that the chance of success on the merits be 'better than negligible.'" *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Sofinet v. INS*, 188 F.3d 513, 514 (7th Cir. 1999)). Rather, "likelihood of success remains a prerequisite." *United States v. Transocean Deepwater Drilling, Inc.*, 537 F. App'x 358, 361 (5th Cir. 2013) (per curiam) (quoting *Ruiz v. Estelle*, 666 F.2d 854, 856-57 (5th Cir. 1982)). This rule is especially important where a plaintiff seeks to preliminarily enjoin state officials from enforcing state laws, for "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd. Of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977).

## ARGUMENT

### I.   Plaintiffs Have Failed to Show a Reasonable Likelihood of Success on the Merits of Their Fourteenth Amendment or Twenty-Sixth Amendment Claims

Plaintiffs seek a preliminary injunction on the basis of their claim that Indiana law's limitations on who may vote by absentee ballot, Ind. Code § 3-11-10-24(a), is unconstitutional "as applied during the pandemic" under the Fourteenth and Twenty-

Sixth Amendments. (Plaintiffs' complaint also raises a claim under the Indiana Constitution's Immunities Clause, but their preliminary injunction motion does not rely on this claim.) Plaintiffs have failed to show a likelihood of success on the merits of these claims, so the Court should deny their preliminary injunction motion.

## A. Plaintiffs have failed to show a likelihood of success on the merits of their Fourteenth Amendment claims

1. Plaintiffs' Fourteenth Amendment claims are directly foreclosed by the Supreme Court's decision in *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969), which squarely rejected an analogous Equal Protection Clause challenge to a state law limiting absentee voting. The claims at issue in *McDonald* were materially identical to the claims Plaintiffs press here. In *McDonald* the plaintiffs argued that the Equal Protection Clause prohibited Illinois from permitting absentee voting for some groups—"(1) those who are absent from the county of their residence for any reason whatever; (2) those who are 'physically incapacitated' . . . ; (3) those whose observance of a religious holiday precludes attendance at the polls; and (4) those who are serving as poll watchers in precincts other than their own"—but not others, in particular the plaintiff class of "unsentenced inmates . . . who . . . cannot readily appear at the polls either because they are charged with nonbailable offenses or because they have been unable to post the bail imposed by the courts of Illinois." *Id.* at 803–04.

The Court observed that "underlying" the plaintiffs' claim was "the assertion that since voting rights are involved, there is a narrower scope for the operation of

the presumption of constitutionality than would ordinarily be the case with state legislation challenged in this Court." *Id.* at 806. And the Court flatly *rejected* that assertion: Strict scrutiny was "not necessary" because Illinois law did not draw distinctions "on the basis of wealth or race" and because "there is nothing in the record to indicate that the Illinois statutory scheme has an impact on appellants' ability to exercise the fundamental right to vote," *id.* at 807, "[s]ince there is nothing in the record to show that [the plaintiffs were] in fact *absolutely prohibited from voting by the State*," *id.* at 808 n.7 (emphasis added). Because it was "thus not the right to vote that is at stake here but a claimed right to receive absentee ballots," *id.* at 807, the Illinois law's "distinctions" were merely required to "bear some rational relationship to a legitimate state end," *id.* at 809. And the Court concluded they did: While "Illinois could, of course, make voting easier for all concerned by extending absentee voting privileges to" the plaintiffs, "[i]ts failure to do so, however, hardly seems arbitrary, particularly in view of the many other classes of Illinois citizens not covered by the absentee provisions, for whom voting may be extremely difficult, if not practically impossible." *Id.* at 809–10.

*McDonald* thus stands for the proposition that the Constitution does not confer a right to vote by absentee ballot. *See Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 627 n.6 (1969) ("In McDonald . . . we were reviewing a statute which made casting a ballot easier for some who were unable to come to the polls . . . at issue was not a claimed right to vote but a claimed right to an absentee ballot."); *Crawford v.*

*Marion Cty. Election Bd.*, 553 U.S. 181, 209 (2008) (Scalia, J., concurring in the judgment) ("That the State accommodates some voters by permitting (not requiring) the casting of absentee or provisional ballots, is an indulgence—not a constitutional imperative that falls short of what is required."); *Mays v. LaRose*, 951 F.3d 775, 792 (6th Cir. 2020) ("There is no constitutional right to an absentee ballot."). Rational-basis scrutiny therefore applies to distinctions States draw in crafting their absentee-ballot rules so long as States do not "absolutely prohibit[]," *McDonald*, 394 U.S. at 809, voting by other means (such as in-person voting).

And it was for precisely this reason that the Fifth Circuit recently rejected a parallel Equal Protection Clause challenge to Texas's absentee-voting law, which also specifically permits elderly citizens to vote absentee. *See Texas Democratic Party v. Abbott*, 961 F.3d 389, 406 (5th Cir. 2020) ("Because the plaintiffs' fundamental right is not at issue, *McDonald* directs us to review only for a rational basis").

Indeed, Plaintiffs readily admit that the Constitution does not confer a right to vote absentee and that the State could therefore likely eliminate *all* absentee voting if it wished. [Dkt. 14 at 9.] They attempt to sidestep *McDonald* by challenging Indiana's absentee-voter law on an "as applied" basis, contending—like the plaintiffs in *McDonald*—that because the State has "granted some of its citizens a categorical entitlement to vote by mail," its decision not to allow *all* voters to vote by mail violates the Equal Protection Clause. [Dkt. 14 at 11.] *McDonald*, however, establishes that "a state's refusal to provide a mail-in ballot does not violate equal protection unless . . .

the state has 'in fact absolutely prohibited' the plaintiff[s] from voting." *Texas Democratic Party*, 961 F.3d at 404 (internal citation omitted).

Confronting the trouble *McDonald* spells for their claims, Plaintiffs also contend that the decision has been "limited . . . to its facts." [Dkt. 14 at 12.] (citing *Hill v. Stone*, 429 U.S. 289, 300 n. 9 (1975); *O'Brien v. Skinner*, 409 U.S. 1240, 1241 (1972) (Marshall, J., in chambers); *Goosby v. Osser*, 409 U.S. 512, 520–22 (1973)). Every case Plaintiffs cite on this score, however, merely reiterates the uncontroversial point—which *McDonald* itself made—that heightened scrutiny applies *only* when a citizen is "in fact *absolutely prohibited* from voting *by the State*." *McDonald*, 394 U.S. at 808 n.7. *Hill*, which involved a law that categorically denied the vote to citizens who failed to list property with the local tax assessor, explained that *McDonald* did not control because the Illinois absentee-voting law at issue in *McDonald* did not have "any impact on the appellants' exercise of their *right to vote*"; it merely limited one form of voting and did not "actually restrain[ ] the *fundamental right to vote*." 429 U.S. at 300 n.9 (emphasis added). *O'Brien* and *Goosby* make the same point: Heightened scrutiny is appropriate only where "the State has rejected alternative means by which applicants might exercise their right to vote" (such as in-person voting). *O'Brien*, 409 U.S. at 1241 (Marshall, J., in chambers); *see also Goosby*, 409 U.S. at 521–22 (explaining that *McDonald* did not bar the plaintiffs' claims because they "allege[d] that, unlike the appellants in *McDonald*, the Pennsylvania statutory scheme *absolutely prohibits them from voting*" (emphasis added)).

And in any case, the Supreme Court has consistently reiterated that *it*—not lower courts—has the sole power to overturn its precedents, which is not something the Court normally does "*sub silentio*." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000). Because the Court has not overturned *McDonald*, the decision remains good law. After all, *Burdick* itself "cites it favorably." *Texas Democratic Party*, 961 F.3d at 406 (citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). "*McDonald* lives." *Id.*

Accordingly, *McDonald* requires that the distinctions drawn by Indiana's absentee-voter law be subject to merely rational-basis review. And here Plaintiffs' principal objections seems to be to the Indiana legislature's decision to allow elderly Hoosiers to vote absentee while not allowing *all* Hoosiers to vote absentee for any reason. But "because an age classification is presumptively rational, the individual challenging its constitutionality bears the burden of proving that the 'facts on which the classification is apparently based could not reasonably be conceived to be true by the governing decisionmaker.'" *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 84 (2000) (quoting *Vance v. Bradley*, 440 U.S. 93 (1979); *see also Massachusetts Bd. Of Retirement v. Murgia*, 427 U.S. 307, 314 ("Even if the statute could be said to impose a penalty upon a class defined as the aged, it would not impose a distinction sufficiently akin to those classifications that we have found suspect to call for strict judicial scrutiny."). "[W]here rationality is the test, a State 'does not violate the Equal Protection Clause merely because the classifications made by its law are imperfect.'" *Id.* at 316. Rational-basis review "'is not a license for courts to judge the wisdom, fairness, or

logic of legislative choices.'" *Johnson v. Daley*, 339 F.3d 582, 587 (7th Cir. 2003) (quoting *Heller v. Doe*, 509 U.S. 312, 319 (1993)).

Despite the circumstances created by COVID-19 and the implications they have on life in the public square, elected officials are better-equipped to assess the public health issues at play and appropriately address them. In particular, age-based considerations are commonplace in election laws, and Indiana's decision to allow all elderly voters to vote absentee fits squarely in the realm of "rationally related to a legitimate state interest," for the State has a clear and direct interest in encouraging elderly citizens—who are more likely to encounter obstacles to getting to the polls—to vote. *See McDonald*, 394 U.S. at 809. Eight States, including Indiana, have identified an interest in encouraging elderly citizens to vote by allowing such citizens to vote absentee-by-mail. *See* Ind. Code § 3-11-10-24(a)(5); Ky. Rev. Stat. Ann. § 117.085(1)(a)(8); La. Stat. Ann. § 18:1303(J); Miss. Code Ann. § 23-15-715(b); S.C. Code Ann. § 7-15-320(B)(8); Tenn. Code Ann. § 2-6-201(5)(A); Tex. Election Code Ann. § 82.003; W. Va. Code § 3-3-1(d)(3). And many of these laws have been place for decades. Kentucky, Tennessee, and Texas, for example, have allowed elderly citizens to vote by absentee ballot for nearly fifty years. *See* Act of June 19, 1976, ch. 247, 1976 Ky. Acts 527; Act of May 3, 1973, ch. 399, 1973 Tenn. Pub. Acts 1411–12; Act of June 20, 1975, ch. 682, 1975 Tex. Gen. Laws 2082.

Indiana's willingness to make accommodations for that vulnerable population does not constitutionally obligate the State to throw the door open to statewide absentee voting. *See McDonald*, 394 U.S. at 810 ("Ironically, it is Illinois' willingness to

go further than many States in extending the absentee voter privileges . . . that has provided appellants with a basis for arguing that the provisions operate in an invidiously discriminatory fashion to deny them a more convenient method of exercising the franchise.").

For this reason alone, Plaintiffs have failed to show a likelihood of success on the merits of their Fourteenth Amendment claim. *McDonald* is itself sufficient to foreclose this claim, particularly given the nearly identical theories and relevant facts between this case and *McDonald*.

2. Even if the Court were to accede to undertake the "*Anderson-Burdick*" analysis Plaintiffs request, moreover, Plaintiffs have still failed to show a likelihood of success on the merits. As the Seventh Circuit recently explained, the *Anderson-Burdick* test is deferential to state legislative judgments: It does not "allow the judiciary to decide whether any given election law is necessary" on the ground that unnecessary laws are "by definition an excessive burden." *Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020). On the contrary, the Supreme Court's decisions "foreclose[ ] that sort of substitution of judicial judgment for legislative judgment." *Id.*

In addition, courts applying this test "must not evaluate each clause [of a State's election law] in isolation." *Id.* Instead, "[c]ourts weigh these burdens against the state's interests by looking at the whole electoral system. Only when voting rights have been severely restricted must states have compelling interests and narrowly tailored rules." *Id.* (internal citations omitted).

16

Plaintiffs fail even to attempt such a system-wide analysis. They have instead directed their arguments specifically at the distinctions Indiana's absentee-voting law draws, particularly its authorization of absentee voting by elderly Hoosiers. *Luft* makes absolutely clear that *Anderson/Burdick* does not license such fine-grained second-guessing. "In isolation, any rule reducing" the number of opportunities to vote "seems like an unjustified burden. But electoral provisions cannot be assessed in isolation. . . . One less-convenient feature does not an unconstitutional system make." *Id.* Because Plaintiffs have only identified a single, "less-convenient feature" of Indiana's voting system, their *Anderson/Burdick* theory fails from the get-go.

And even if the Court were to consider whether Indiana's voting system as a whole "severely restrict[s]" voting rights under *Anderson/Burdick*, *id.*, it plainly does not. Like Wisconsin, Indiana "has lots of rules that make voting easier." *Id.* For example, Indiana has empowered counties to create "vote centers" that provide voters additional places to cast a ballot regardless of their precinct. Ind. Code § 3-11-18.1-13. Indiana also enables online voter registration and provides assistance to voters with disabilities and those unable to understand English. Ind. Code §§ 3-11-9-2; 3-7-26.7-5.

The "net effect" of Indiana's voting rules has led to a turnout rate well in line with other States; according to the Census Bureau, approximately 85% of Indiana registered voters voted in the November 2016 general election, for example. *See* U.S. Census Bureau, *Voting and Registration in the Election of November 2016* (May 10, 2017), Table 4a, https://www.census.gov/data/tables/time-series/demo/voting-and-

registration/p20-580.html (reporting approximately 3.3 million registered voters and approximately 2.8 million votes cast in Indiana).

Finally, as noted, Plaintiffs concede that the Constitution allows Indiana to do away with absentee voting entirely; their objection, at bottom, is that the State allows only some voters to vote absentee. But this argument sounds in rational-basis review, not *Anderson/Burdick*. Allowing certain groups to vote by mail cannot fairly be said to *burden* the voting rights of anyone, much less severely restrict them.

For these reasons, Indiana's absentee-voting law satisfies rational-basis review, and Plaintiffs are thus not likely to succeed on their Fourteenth Amendment challenge to the statute.

## B.   Plaintiffs have failed to show a likelihood of success on the merits of their Twenty-Sixth Amendment claims

The Twenty-Sixth Amendment states, in relevant part, "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. Const. amend. XXVI, § 1. Plaintiffs claim that Indiana Code § 3-11-10-24(a) violates the Twenty-Sixth Amendment's prohibition against the denial or abridgement of the right to vote on account of age because it categorically authorizes all registered voters ages 65 and older to vote by mail, but allows voters under the age of 65 to vote by mail only if they meet any one of the statute's twelve other vote-by-mail qualifications. [Dkt. 14 at 16–17.] Plaintiffs' Twenty-Sixth Amendment claim fails, however, because this statute does not "deny or abridge" Plaintiffs' (or any other voters') right to vote. As explained above, the Constitution confers a right to vote, *not* a right to

18

vote *absentee*. Because Indiana Code § 3-11-10-24(a) merely limits who may vote absentee, it does not run afoul of the Twenty-Sixth Amendment.

*McDonald* forecloses Plaintiffs' Twenty-Sixth Amendment claim for the same reasons it forecloses their Fourteenth Amendment claim. As the Fifth Circuit explained in addressing Twenty-Sixth Amendment arguments strikingly similar to those put forth by Plaintiffs here "[t]he well-respected logic of *McDonald* applies equally to the Twenty-Sixth Amendment claim" challenging Texas's absentee-voter law. *Texas Democratic Party*, 961 F.3d at 408. The Fifth Circuit explained that "employing *McDonald*'s logic leads inescapably to the conclusion that rational-basis review applies" to *both* Fourteenth Amendment and Twenty-Sixth Amendment challenges to absentee-voting laws. *Id.* at 409. "If a state's decision to give mail-in ballots only to some voters does not normally implicate an equal-protection right to vote"—which, as explained above, is precisely what *McDonald* holds—"then neither does it implicate '[t]he right ... to vote' of the Twenty-Sixth Amendment." *Id.* "*McDonald*'s logic applies neatly to the Twenty-Sixth Amendment's text—which was ratified two years after *McDonald*—because the Amendment similarly focuses on whether the state has '"denied or abridged' the right to vote." *Id.*

Accordingly, the Twenty-Sixth Amendment does not prohibit a State from using age as a criterion for absentee voting because such a distinction does not deny or abridge the *right to vote*. It instead merely limits the "claimed right to receive absentee ballots.*" Id.* (quoting *McDonald*, 394 U.S. at 807). Indiana's absentee-voter law thus does not implicate the Twenty-Sixth Amendment at all.

## II.   The Balance of Harms and the Public Interest Weigh Against the Motion

Defendants have a fundamental interest in equal, fair, and consistent enforcement of its election laws. Precisely because "[v]oting is of the most fundamental significance under our constitutional structure," *Burdick,* 504 U.S. at 433, states must have in place a system that balances election security with access to the ballot box. *See Crawford v. Marion County Election Bd.*, 553 U.S. 181, 196-97 (2008) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters;" "public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process.") Too little security, and legitimate votes are diluted by fraudulent ones. Too little access, and voter participation suffers unnecessarily. No magic formula exists, and legislatures, election commissions, and other officials must account for an infinite variety of circumstances when calibrating, as a matter of public policy, competing demands for security and access. *See Bailey v. S.C. State Election Comm'n*, No. 2020-000642, 2020 WL 2745565 at *1 (S.C. May 27, 2020) ("whether [the] law should allow all general election voters vote absentee" in response to the coronavirus outbreak is a non-justiciable political question).

In assessing whether to permit no-excuse absentee-by-mail voting, the Commission members use their statutory authority and 50+ years of combined election experience to consider and weigh, in a public forum, voluminous, conflicting scientific reports, highly technical election administration laws and practices, reports from local election administrators, input from voters, candidates, campaigns and political

parties. To do so they hold public meetings, deliberate in public, and make a record. Commissioners will explain their rationale and be accountable to the public for their decisions, which are subject to judicial review under the state's Administrative Orders and Procedures Act (Ind. Code § 4-21.5 et sec.).

For the June 2020 primary election, the Commission, using the above-outlined process, concluded that the burdens of the COVID-19 pandemic, combined with the generally modest voting rates attendant to a primary election, weighed in favor of adopting an emergency resolution permitting no-excuses absentee-by-mail voting.

Plaintiffs insist that election law is a one-way ratchet, such that, having thereby expanded voting opportunities and loosened election security, the Commission cannot refuse to do the same for the November general election. But neither the Commission nor the General Assembly, having adopted a particular mix of voter access and election security for one election, or forbidden from recalibrating that mix in future elections. Defendants' insight and understanding of COVID-19 and how it impacts life in the public forum is growing and evolving with each passing day. The precautionary measures known to be effective in the June 2020 primary election are different from those known now, and the knowledge about combatting and containing COVID-19 will only grow between now and the November 2020 general election.

Furthermore, based on experience, Defendants anticipate much higher voter turnout in the November general election than occurred during the primary election. Indiana's voting systems are equipped to handle that higher turnout when the bulk of it occurs for in-person voting, whether on Election Day or before (*i.e.*, during the 28

days prior to Election Day when voters can cast their ballot through what is called "absentee-in-person" voting). Permitting no-excuse absentee-by-mail voting, however, would shift vast numbers of voters to an entirely different system.  The Commission must consider, among many other factors, whether the Indiana election system—meaning not only state officials, but county officials, volunteers, equipment and facilities, to say nothing of the United States Postal Service—can handle such a dramatic shift in the logistics of collecting and tabulating ballots. During the primary, many counties already experienced problems with undelivered and overdelivered ballots, facially defective ballots, and late returned ballots that were never counted. The Commission must consider whether such problems, plus the cost of building and staffing the infrastructure necessary to facilitate exponentially greater numbers of absentee ballots, may overwhelm the integrity of the vote-counting system in place in Indiana—and whether the time remaining between now and the November 3, 2020 general election is sufficient to procure the resources (including millions of ballots, envelopes, and funding) necessary for statewide absentee-by-mail voting.

Following the 2020 primary election, many counties saw a significant increase in the time required to open, process, and tally the vastly increased number of absentee-by-mail ballots. This time consuming endeavor caused many counties to delay finalizing their vote tallies and the certification of election results.  With a controversial and hotly contested presidential race and other important and vigorously contested races, the 2020 general election requires state and local officials to provide final vote tallies as quickly as possible. The Commission must consider whether a

delay in county reporting occasioned by massive numbers of absentee-by-mail ballots, and accompanying uncertainty regarding election outcomes—or, for that matter, massive numbers of absentee-by-mail ballots that are disqualified because late or defective—could foreseeably result in escalated civil unrest akin to what the Nation has experienced in recent months.

What Defendants and local officials *can* accomplish between now and Election Day, however, is to establish reasonable precautions against the spread of COVID-19 at the polls. For every election, the Secretary of State, in her capacity as the state's chief Election Officer, coordinates development of election emergency preparedness and contingency plans. She holds meetings with planners and emergency responders, produces and distributes a handbook and a list with emergency contact information. Her office has for the November election, prepared plans to contend for all sorts of emergencies impacting individual polling locations, counties or the entire state.  The Secretary of State is assisting counties and the Election Commission with a steady stream of high-level expertise, data and analysis on factors impacting election administration, the voting process and likely to impact voter turnout, as well as estimations of voter turnout and resources needed to conduct efficient and trusted elections.

The Secretary of State implemented numerous safety precautions in advance of the 2020 primary election. With the help of the Indiana National Guard and with the use of CARES Act funding, the Secretary of State provided personal protective equipment (PPE), including face masks, gloves, face shields, sneeze guards, hand sanitizer, and surface and equipment disinfectant, to all 92 counties to be used during

the 2020 primary election, and engaged in media campaigns to promote voter aware-ness and participation. [Dkt. 53-4 at ¶7.] The Secretary of State again plans to un-dertake extensive precautions in preparation for the 2020 general election, including distributing over 1 million face masks, over 1.5 million gloves, 20,000 half-gallon bot-tles of hand sanitizer, 5,000 gallons of surface and equipment disinfectant, and other PPE supplies for voters and for poll workers with the help of the Indiana National Guard, and the Secretary of State will have the financial ability to procure and dis-tribute additional PPE as necessary. [Dkt. 53-4 at ¶8.] The Secretary of State also plans to provide all precincts with a manual on best safety practices for voters and poll workers based on CDC guidelines, posters on pandemic safety precautions, and social distancing markers to be used in the 2020 general election. [Dkt. 53-4 at ¶9.]

On the other hand, Plaintiffs' position that they are unable to cast their votes in person due to the dangers presented by COVID-19 are undermined by the fre-quency that they have ventured out of their homes for unnecessary purposes. See [Dkt. 53-9 at 5-11.] Plaintiffs' reliance on wearing masks and social distancing as being sufficient precautionary measures against COVID-19 for going out for drinks, visiting with friends, and going to the gym, but not for voting in person in the 2020 general election is inconsistent.

Under these circumstances, where the Commission must exercise fact-depend-ent judgment balancing a host of competing concerns—judgment for which it is polit-ically accountable—and where plaintiffs have well-recognized, reasonable options for safely voting in-person (whether on Election Day or during the 28 days before), the

balance of equities disfavors an injunction straightjacketing the Commission into a single solution.

## <u>CONCLUSION</u>

A preliminary injunction is an extraordinary and drastic remedy, and should only be granted in instances where Plaintiffs, by a *clear showing*, carry the burden of persuasion for all of the conditions. Plaintiffs have failed to carry that burden, and as such, Plaintiffs' motion for preliminary injunction should be denied.

Respectfully submitted,

Curtis T. Hill, Jr.
Attorney General of Indiana

Date: July 24, 2020          By:          Jefferson S. Garn
Deputy Attorney General

Thomas M. Fisher
Solicitor General

Kian J. Hudson
Deputy Solicitor General

Courtney Abshire
Deputy Attorney General

Parvinder Nijjar
Deputy Attorney General

*Counsel for Defendants Paul Okeson, S. Anthony Long, Suzannah Wilson Overholt, and Zachary E. Klutz, and Connie Lawson*

Office of Indiana Attorney General
Indiana Government Center South, 5th Floor
302 West Washington Street
Indianapolis, IN 46204-2770
Phone: (317) 234-7019
Fax: (317) 232-7979

25

Jefferson.Garn@atg.in.gov