# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BARBARA TULLY, KATHARINE BLACK, MARC BLACK, DAVID CARTER, REBECCA GAINES, ELIZABETH KMIECIAK, CHAQUITTA MCCLEARY, DAVID SLIVKA, DOMINIC TUMMINELLO, and INDIANA VOTE BY MAIL, INC., individually, and on behalf of those similarly situated, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| -vs- | ) ) | Case No. 1:20-cv-01271-JPH-DLP |
| PAUL OKESON, S. ANTHONY LONG, SUZANNAH WILSON OVERHOLT, and ZACHARY E. KLUTZ, in their official capacity as members of the Indiana Election Commission, and CONNIE LAWSON, in her official capacity as the Indiana Secretary of State, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

Gary A. Isaac (*pro hac vice*)
Jeffrey M. Strauss (*pro hac vice*)
Brett E. Legner (*pro hac vice*)
Jed W. Glickstein (*pro hac vice*)
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600
Email: gisaac@mayerbrown.com
Email: jstrauss@mayerbrown.com
Email: blegner@mayerbrown.com
Email: jglickstein@mayerbrown.com

*Of Counsel*

William R. Groth, Of Counsel
MACEY SWANSON LLP
445 N. Pennsylvania St., Suite 401
Indianapolis, IN 46204
Tel: (317) 637-2345, Ext. 132
Email: WGroth@fdgtlaborlaw.com

Mark W. Sniderman, 26599-49
FINDLING PARK CONYERS WOODY & SNIDERMAN, P.C.
151 N. Delaware Street, Ste. 1520
Indianapolis, IN 46204
(317) 231-1100 Tel
(317) 231-1106 Fax
Email: msniderman@findlingpark.com

Dated: July 31, 2020

*Counsel for Plaintiffs*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................1

I.   Plaintiffs Have Shown A Strong Likelihood Of Success On The Merits.................................6

   A.  Plaintiffs Are Likely To Succeed On Their Fourteenth Amendment Claim .......................6

      1.   The State's Restrictions On Voting By Mail Fail Under *Anderson-Burdick*.............7

      2.   *McDonald* Is Not To The Contrary.........................................................11

   B.  Plaintiffs Are Likely To Succeed On Their Twenty-Sixth Amendment Claim................13

II.  Plaintiffs Have Satisfied Their Burden For A Preliminary Injunction ...................................18

CONCLUSION....................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acevedo v. Cook Cnty. Officers Electoral Bd.*,
   925 F.3d 944 (7th Cir. 2019) ................................................................6

*Burdick v. Takushi*,
   504 U.S. 428 (1992).......................................................................6, 7, 8

*Carrington v. Rash*,
   380 U.S. 89 (1965)...........................................................................19

*Common Cause R.I. v. Gorbea*,
   2020 WL 4365608 (D.R.I. July 30, 2020) ...............................................7

*Common Cause Ind. v. Indiv. Members of the Ind. Election Comm'n*,
   800 F.3d 913 (7th Cir. 2015) ............................................................6, 8

*Cook Cnty. v. Wolf*,
   962 F.3d 208 (7th Cir. 2020) ...............................................................19

*Crawford v. Marion Cnty. Election Bd.*,
   553 U.S. 181 (2008)........................................................................6, 8

*Fisch v. Schwab*,
   957 F.3d 1105 (10th Cir. 2020) ...........................................................9

*FTC v. Credit Bureau, LLC*,
   937 F.3d 764 (7th Cir. 2019) .............................................................19

*Gill v. Scholz*,
   962 F.3d 360 (7th Cir. 2020) ...............................................................6

*Griffin v. Roupas*,
   385 F.3d 1128 (7th Cir. 2004) .............................................................11

*Harman v. Forssenius*,
   380 U.S. 528 (1965)........................................................14, 15, 17, 20

*Jolicoeur v. Mihaly*,
   488 P.2d 1 (Cal. 1971) ................................................................15, 17

*Jones v. McGuffage*,
   921 F. Supp. 2d 888 (N.D. Ill. 2013) ....................................................18

## TABLE OF AUTHORITIES (CONTINUED)

Page(s)

*Lane v. Wilson,*
  307 U.S. 268 (1939)..................................................................14, 15, 16, 17

*League of Women Voters of Va. v. Va. State Bd. of Elections,*
  2020 WL 2158249 (W.D. Va. May 5, 2020)...................................7, 8, 9, 19

*Luft v. Evers,*
  963 F.3d 665 (7th Cir. 2020) ...................................................10, 11, 16, 17

*McDonald v. Bd. of Election Comm'rs of Chicago,*
  394 U.S. 802 (1969).......................................................................... *passim*

*Obama for America v. Husted,*
  697 F.3d 423 (6th Cir. 2012) ...................................................................12

*People First of Ala. v. Merrill,*
  2020 WL 3207824 (N.D. Ala. June 15, 2020)....................................7, 8, 9

*Price v. N.Y. State Bd. of Elections,*
  540 F.3d 101 (2d Cir. 2008)......................................................................12

*Reno v. Bossier Par. Sch. Bd.,*
  528 U.S. 320 (2000)...................................................................................17

*Republican Nat'l Comm. v. Democratic Nat'l Comm.,*
  140 S. Ct. 1205 (2020)...............................................................................19

*Schmitz v. Marion Cnty. Bd. of Elections,*
  2019 WL 4243196 (S.D. Ind. Sept. 5, 2019) ..............................................6

*In re State,*
  2020 WL 2759629 (May 20, Tex. 2020) ...................................................13

*Texas Democratic Party v. Abbott,*
  961 F.3d 389 (5th Cir. 2020) .................................................12, 13, 15, 16

*Thomas v. Andino,*
  2020 WL 2617329 (D.S.C. May 25, 2020).............................................7, 12

*Walgren v. Bd. of Selectmen of Town of Amherst,*
  519 F.2d 1364 (1st Cir. 1975)...................................................................16

**INTRODUCTION**

Defendants' Response in Opposition to Plaintiffs' Motion for a Preliminary Injunction, Dkt. 53 ("Resp."), fails to acknowledge both the narrowly tailored relief sought by Plaintiffs and the extraordinary circumstances under which we are all living in this time of global pandemic.

Defendants begin their Response by stating that "Plaintiffs' argument . . . is 'that the Constitution requires all states to allow unlimited absentee voting.'" Resp. 1-2. That is simply false. Plaintiffs are *not* asking this Court to hold that all voters in all states at all times have a constitutional right to vote by mail. Rather, Plaintiffs contend that during this unprecedented pandemic, Indiana voters under age 65 must be afforded the same choice for the November election that voters 65 and older already have—to vote by mail, rather than in person, to reduce their risk of contracting COVID-19.[1]

To grant Plaintiffs' motion for a preliminary injunction, the Court need not adopt a novel interpretation of the Indiana Election Code or make any extraordinary factual findings. As discussed in our opening brief, the Defendant members of the Indiana Election Commission ("IEC") have *already* found that "Indiana Code 3-11-4-1(c) permits the Commission, in an emergency, to allow a person who is otherwise qualified to vote in person the ability to vote by absentee ballot." *See* Dkt. 14 ("Pls. Mem.") at 4; Dkt. 53-8 (IEC Order 2020-37, dated March 25, 2020) at 1. Those same Defendants—citing, among other things, Governor Holcomb's declaration of "a public health disaster emergency" and President Trump's declaration of a "national emergency" due to the COVID pandemic—recognized that Indiana was in the midst of just such an emergency. *Id.* Thus far, over 4.4 million people in the United States have

---

[1] It is not only Plaintiffs that have urged Defendants, in light of the worsening COVID situation, to take appropriate steps immediately to implement no-excuse absentee voting by mail for the November general election. *See, e.g.*, Dkt 61-1, Ex. 1 (July 28, 2020 op-ed in Terre Haute *Tribune-Star* by John Mutz, former Indiana Republican lieutenant governor; Lee Hamilton, former Democratic representative for Indiana's 9th Congressional District; Paul Helmke, former three-term Republican mayor of Fort Wayne and former president and CEO of the Brady Center; and Pierre M. Atlas, professor of political science at Marian University); Dkt. 61-2, Ex. 2 (July 26, 2020 editorial in Fort Wayne *Journal Gazette*); and Dkt. 61-3, Ex. 3 (July 23, 2020 Statement of Indiana Advisory Committee to the U.S. Commission on Civil Rights).

been infected with COVID and more than 152,000 have died from it. Dkt. 61-4, Ex. 4, N.Y. Times, *Coronovarius in the U.S.: Latest Map and Case Count*, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (visited July 31, 2020).

In adopting no-excuse absentee balloting for the June 2 Indiana primary, Defendants construed the governing statute (Indiana Code § 3-11-10-24) so that "voter with disabilities" includes "a voter who is unable to complete their ballot because they are temporarily unable to physically touch or be in safe proximity to another person." Dkt. 53-8 at 4. Having already decided that the pandemic conditions warranted allowing no-excuse absentee voting by mail for the primary, there is no legitimate basis for Defendants to change course now. The public health emergency that existed on March 25 when the IEC adopted no-excuse absentee balloting for the primary, and that existed on June 2 when the State held that primary, continues today. If anything, it is only getting worse.

Indeed, on July 24, 2020—the same day that Defendants filed their Response in this Court—Governor Holcomb issued a new Executive Order, reiterating that "a public health emergency exists throughout the State of Indiana as a result of the coronavirus disease 2019 (COVID-19) outbreak," noting that President Trump has "declared a national emergency with respect to this dangerous virus," and warning of the worsening conditions in Indiana. Dkt. 61-5, Ex. 5, Executive Order 20-37, at 1. Governor Holcomb's Executive Order states:

- "as of the date of this Executive Order, the virus has now spread to every county in our State, with over 60,000 confirmed cases and over 2,600 deaths";

- "throughout many areas across the United States including Indiana, there are signs of increased coronavirus spread and evidence of resurgence";

- "there has been a rise in COVID-19 positivity across the state from a low of 3.6% a month ago to nearly double that percentage now";

- "our overall hospitalization census has increased from approximately 600 a day near the end of June to approximately 800 now";

- "some counties which early on had minimal positive cases, in some instances are now reporting regular double-digit COVID-19 positive cases"; and,

- "our surrounding states are all experiencing increases in positive cases."

*Id*. at 1-2. "[B]ased upon" those conditions, Governor Holcomb ordered that "every individual within the State of Indiana shall wear a face covering over the nose and mouth" when "inside a business, public building, or other indoor space open to the public." *Id*. at 2.[2]

There is a complete disconnect between Governor Holcomb's Executive Order 20-37 and the position taken by Defendants in this litigation. During this public health emergency, Defendants should be doing everything within their power to protect Hoosiers' practical ability to vote while also safeguarding citizens' health to the greatest degree possible. They plainly are not.

Defendants say that "Indiana election officials are taking extraordinary precautions to protect voters from the COVID-19 pandemic." Resp. 6. It is good that Defendants plan to make PPE and hand sanitizer available, and to try to enforce social distancing, in polling places in November. But the best protection would be to allow all Hoosiers to choose to vote by mail, and to avoid public gatherings—including polling stations—to the maximum extent possible. In the run-up to the June primary, Indiana Secretary of State Connie Lawson—a Defendant in this case—stated that "the safest way to vote is by absentee mail-in ballot" and "encouraged everyone to do so." Dkt. 61-6, Ex. 6, Niki Kelly, Journal Gazette, *Secretary of State buys, distributes PPE to make primary election safer* (May 15, 2020), https://www.journalgazette.net/article/20200515/WEB/200519907.

---

[2] The Indiana figures have continued to worsen since July 24, when Governor Holcomb issued Executive Order 20-37. According to the State's "COVID-19 Dashboard," as of July 29, Indiana has had over 65,000 COVID cases and almost 2,750 deaths, and has an 8.9% positivity rate among those tested. Dkt. 61-7, Ex. 7, *Indiana COVID-19 Data Report*, https://www.coronavirus.in.gov/2393.htm (last visited July 31, 2020). Approximately 74% of the Hoosiers that have contracted COVID are under the age of 60. *Id*. ("Statewide Demographics For Positive Cases," by "age").

Defendants' decision to deprive most Hoosier voters of the choice to vote by mail and to force them—if they are to vote at all—to place themselves in harm's way by going into a public polling place to vote is cavalier, to the point of being reckless. In choosing to put Indiana voters at increased risk, Defendants wholly ignore the very CDC guidance they purport to rely on, which expressly advises "elections officials in advance of election day" to "[e]ncourage voters to use voting methods that minimize direct contact with other people and reduce crowd size at polling stations" and "[*e*]*ncourage mail-in* methods of voting if allowed in the jurisdiction." Dkt. 53-4 at 28 (emphasis added); see also Resp. 7 (citing CDC guidelines). The IEC has already recognized, in adopting no-excuse absentee voting by mail for the June 2 primary, that in light of the COVID emergency, no-excuse voting by mail is, in the CDC's words, "allowed in the jurisdiction." If Defendants truly wish to follow the science and CDC guidelines, they should allow no-excuse voting by mail in November.[3]

Defendants also say that "[i]n allowing no-excuse absentee-by-mail voting" during the primary, "many counties experienced challenges processing the larger-than-usual volume of absentee ballots— challenges that would not have arisen if the election had used the normal voting rules that generally require

---

[3] As reflected in Dkt. 61-8, Ex. 8, the CDC has also stated that:

- "It's not just those over the age of 65 who are at increased risk for severe illness . . . Everyone, especially older adults and others at increased risk of severe illness, should take steps to protect themselves from getting COVID-19", https://www.cdc.gov/media/releases/2020/p0625-update-expands-covid-19.html;

- "An estimated 60 percent of American adults have at least one chronic medical condition"—including common health conditions like asthma, high blood pressure, and pregnancy—that may put them at an increased risk of "severe COVID-19 illness," https://www.cdc.gov/media/releases/2020/p0625-update-expands-covid-19.html;

- "The best way to protect yourself and to help reduce the spread of the virus that causes COVID-19 is to" "[l]imit your interactions with other people as much as possible," https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html; and,

- "In general, the more people you interact with, the more closely you interact with them, and the longer that interaction, the higher the risk of COVID-19 spread," https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/deciding-to-go-out.html.

in-person voting." Resp. 5. And according to Defendants, "[i]f no-excuse absentee-by-mail voting is permitted for the general election in November, these problems would be far larger due to far greater voter participation." *Id.* But we are not living in "normal" times, and the fact that many Indiana voters of all ages would want to vote by mail is precisely the point. Voters are understandably concerned for their health, and their lives, if they are forced to vote in person during this pandemic. That is why the State can expect a large number of requests for absentee ballots. And that is why Defendants must prepare now to accommodate those requests. Voters do not wish to put their lives in jeopardy to exercise one of their most fundamental rights. And there is no good reason for the State to force them to do so.

As shown in Plaintiffs' opening brief and below, in the midst of a global pandemic, limiting no-excuse absentee voting by mail to those 65 and older violates the Fourteenth and Twenty-Sixth Amendments to the United States Constitution. Time to make the preparations necessary to allow all Hoosier voters to vote absentee-by-mail in November is fast running out. This lawsuit was filed on April 29. The preliminary injunction motion was filed five weeks later. All the evidence indicates that the pandemic will continue into the fall, and may well get worse. Earlier this month, Indiana State Health Commissioner Dr. Kristina Box warned that the State should prepare for a surge in COVID-19 cases this fall. *See* Dkt. 61-9, Ex. 9, Indianapolis Star, *State prepares for fall surge of COVID cases* (July 16, 2020), http://indianapolisstar.in.newsmemory.com/?publink=29f30879f. Yet Defendants have done nothing to prepare for the possibility of significant mail-in voting, and now complain that doing so would be time-consuming and cost money. Defendants have abdicated their responsibility to provide safe and effective voting for all of Indiana's citizens. They must now be required to act. The Constitution requires no less.

Accordingly, Plaintiffs ask the Court to order Defendants to immediately (i) instruct all county election boards that all voters must be allowed to apply for and receive an absentee ballot without regard to their age and without excuse, and be permitted to vote by mail, in the November 3, 2020 general election,

and (ii) take whatever additional administrative actions are necessary and appropriate to implement no-excuse absentee voting by mail for the November 3, 2020 general election.

## I.      Plaintiffs Have Shown A Strong Likelihood Of Success On The Merits.

### A.      Plaintiffs Are Likely To Succeed On Their Fourteenth Amendment Claim.

Plaintiffs' Fourteenth Amendment challenge is assessed under the *Anderson-Burdick* balancing test, which the Seventh Circuit has held "applies to *all* First and Fourteenth Amendment challenges to state election laws." *Acevedo v. Cook Cnty. Officers Electoral Bd.*, 925 F.3d 944, 948 (7th Cir. 2019) (emphasis in original); *see also Common Cause Ind. v. Indiv. Members of the Ind. Election Comm'n*, 800 F.3d 913, 922 n.12 (7th Cir. 2015); *Schmitz v. Marion Cnty. Bd. of Elections.*, 2019 WL 4243196, at *4 (S.D. Ind. Sept. 5, 2019). The *Anderson-Burdick* test balances the "character and magnitude of the asserted injury" to voting rights against the strength of the state's particular interests in the restriction. *Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992).

Defendants have no real answer under this test because they already decided—for Indiana's June 2 primary—that the ongoing COVID public health emergency justified construing state law to allow all Indiana voters to vote absentee by mail. They thus try to change the subject, contending that *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969), makes this an open-and-shut case. This attempt to short-circuit the inquiry flies in the face of established doctrine. As the Seventh Circuit said last month, the *Anderson-Burdick* test is "not automatic" and "requires courts to conduct fact-intensive analyses when evaluating state electoral regulations." *Gill v. Scholz*, 962 F.3d 360, 365 (7th Cir. 2020). Courts cannot "apply a 'litmus test' that would neatly separate valid from invalid restrictions." *Id.* (citing *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190 (2008)). As shown below, a host of courts have applied *Anderson-Burdick* to uphold challenges to absentee voting procedures, even though those procedures did not literally (in *McDonald*'s words) "absolutely prohibit" the challengers from voting.

      **1.**      **The State's Restrictions On Voting By Mail Fail Under *Anderson-Burdick*.**

Defendants devote barely two pages to their argument that Plaintiffs are unlikely to succeed if the Court "accedes to undertake" the *Anderson-Burdick* analysis. Resp. 16-18. This cursory discussion does not come close to rebutting the showing in Plaintiffs' opening brief (at 7-16) that they have a sufficient likelihood of success at this juncture to support their request for a preliminary injunction.

    **a.** The first step of the *Anderson-Burdick* test is to assess the burden that Indiana's restrictions on absentee voting-by-mail place on voters in the context of the COVID-19 pandemic. *Burdick*, 504 U.S. at 434. As the IEC recognized when it issued its emergency orders permitting no-excuse absentee voting for the June 2 primary, requiring voters who are concerned with exposing themselves, their families, or others to COVID-19 to go to the polls for an election places a burden on voting that is undeniable and severe. Case law, and common sense, overwhelmingly support this conclusion. *See People First of Ala. v. Merrill*, 2020 WL 3207824, at *2, *14-15 (N.D. Ala. June 15, 2020) (recognizing "the burdens imposed by the challenged election laws on voters at high risk of severe complications or death from COVID-19"); *Thomas v. Andino*, 2020 WL 2617329, at *17 (D.S.C. May 25, 2020) (recognizing the "undu[e]" burdens "during this pandemic"); *League of Women Voters of Va. v. Va. State Bd. of Elections*, 2020 WL 2158249, at *8 (W.D. Va. May 5, 2020) (similar). Just yesterday, a district court in Rhode Island agreed that restrictions on mail-in voting, "as applied during the COVID-19 pandemic," violate the Fourteenth Amendment because they "place[] an unconstitutional burden on the right to vote." *Common Cause R.I. v. Gorbea*, 2020 WL 4365608, at *4 (D.R.I. July 30, 2020).[4]

Defendants do not even mention, let alone make any attempt to distinguish, *People First*, *Thomas*, and *League of Women Voters*. To the extent Defendants discuss burden at all, it is only to focus on what

---

[4] *Common Cause R.I.*, *People First*, *Thomas*, and *League of Woman Voters* addressed—and preliminarily enjoined or approved consent decrees suspending—requirements that absentee voters obtain a witness signature in order for the mail-in ballot to be counted. Such rules necessarily impose far lighter burdens on voters than a blanket *prohibition* on absentee mail-in voting that applies to all except groups mentioned in Ind. Code § 3-11-10-24.

Defendants cast as Plaintiffs' decision to "venture[] out of their homes" for "unnecessary purposes." Resp. 24; *see also id*. at 7-8. That aside is not just unfair, but irrelevant. As their discovery responses make clear (*see* Dkt. 53-9), Plaintiffs have complied fully with all public health recommendations when leaving their homes, including wearing masks and social distancing, to a degree that likely will not be possible in polling places crowded with strangers in November. *See* Dkt. 61-10, Ex. 10 (Eldridge Decl.) ¶ 7 (declaration from Marion County Clerk explaining that "[n]either my staff nor our volunteer poll workers have any means of enforcing the face covering or social distancing requirements"); Dkt. 61-11, Ex. 11, Fajman Decl. ¶¶ 4, 10 (same from Director of Lake County Board of Elections and Registration, noting that "[m]any voters will refuse to wear facial covering because of the strong philosophical and in some instances political objections to doing so, and the lack of penalties severe enough to deter non-compliance"). In any event, as Justice Scalia noted in *Crawford*, the Equal Protection Clause ultimately is not concerned with particular plaintiffs but with the groups that are disfavored by the State's classification more broadly. Especially here, where the risks of in-person voting apply to every member of society, the burden of the State's refusal to make no-excuse absentee mail-in voting available should be assessed "categorically" rather than "consider[ing] the peculiar circumstances of individual voters." 553 U.S. at 206-207. As Defendants' orders pertaining to the June 2 primary recognize, it is undeniable that these are "not ordinary times," *League of Women Voters*, 2020 WL 2158249, at *8, and that COVID poses a substantial burden for Indiana's electorate.

**b.**  The second step of the *Anderson-Burdick* test is to consider "the precise interests put forward by the State as justifications for the burden imposed by its rule." *Burdick*, 504 U.S. at 434. If, as here, the burdens on voters are significant, the Court should apply something approaching strict scrutiny to assess whether the State's interests justify the restriction. *Common Cause*, 800 F.3d at 917. Yet even an election requirement that "imposes only a slight burden on the right to vote" still "must be justified by relevant

and legitimate state interests 'sufficiently weighty to justify the limitation.'" *People First*, 2020 WL 3207824, at *15 (citing *Crawford*, 553 U.S. at 191). Defendants fail to identify—and offer no real evidence to establish—any sufficiently "weighty" interests to justify their refusal to adopt no-excuse absentee voting by mail for the upcoming general election.

    *First*, Defendants allude to an interest in combating voter fraud, stating in their Background section (at 3) that "[v]oting by mail introduces the potential of fraudulent voting." However, Plaintiffs have submitted an uncontroverted declaration from a voting expert who explains that fraud is "as uncommon" during vote-by-mail elections as "during in-person voting," with Americans "more likely" to be "struck by lightning." Dkt. 13-14 at ¶¶ 27-32. That is consistent with the experience of the Marion County Clerk and the Director of the Lake County Board of Elections and Registration, who have observed no evidence of fraud in the mail-in absentee balloting process. Dkt. 61-10, Ex. 10 ¶ 8; Dkt. 61-11, Ex. 11 ¶ 11. For their part, Defendants do not cite any evidence that their adoption of no-excuse absentee voting by mail for the primary led to any fraud or explain why this speculative risk outweighs the inevitable disenfranchisement of Indiana voters if a similar rule is not adopted for the general election. A purported interest in protecting against fraud "in the abstract" is not enough if there is no "evidence that such an interest made it necessary to burden voters' rights here." *Fisch v. Schwab*, 957 F.3d 1105, 1133 (10th Cir. 2020); *see also League of Women Voters*, 2020 WL 2158249, at *9 (there is "no evidence in the record at this time" to suggest that accommodating voters' need to vote by mail during the pandemic "would increase voter fraud in a meaningful way"); *People First*, 2020 WL 3207824, at *16-17 (same).

    *Second*, also in the Background section, Defendants contend that absentee voters are "more prone to cast invalid ballots" than those who visit the polls in person. Resp. 4. There are steps Defendants can take to ameliorate these problems.[5] Regardless, the concern that *some* voters might cast an invalid ballot

---

[5] For example, certain of Defendants' declarants note that some ballots were not counted during the primary because they were delivered after the noon deadline for mail-in ballots on election day. Dkt. 53-1 ¶ 7; Dkt. 53-2 ¶ 6. As the

makes no sense as a basis for refusing to permit all voters to vote by mail during the pandemic *if they choose*. After all, the Hoosiers most burdened by the State's restrictions on mail-in voting likely will not go to a polling place because of fears about COVID. For those voters, the choice is not between voting by mail and voting in-person. It is between voting by mail and not voting at all.

**Finally**, in discussing the balance of harm if an injunction should issue, Defendants say that "no-excuse absentee-by-mail voting" will shift "vast numbers" of voters from in-person to by-mail voting. Resp. 22. This cuts squarely against Defendants, not in their favor. The reason so many voters sought to vote by mail during the primary is that many voters did not feel safe going to polling places and exposing themselves, their families, and their communities to risks from the coronavirus. And Defendants' expectation that many more voters will want to vote by mail in the general election shows that now the public's demand for expanded mail-in voting is even greater. There is no reason to think that Indiana will face greater logistical challenges than the thirty-plus states that already allow no-excuse mail-in voting in general elections. *See* Dkt. 61-12, Ex. 12, National Vote at Home Institute, *Applying for a Mailed-out Ballot: A State-by State Guide* (Mar. 2020 update), https://perma.cc/L9X8-SVC8. And of course, to the extent there is legwork to do to ensure that the November election goes as smoothly as possible, the time to do it is right now, which makes Defendants' delay all the more irresponsible.

**c.** Defendants' principal argument under the *Anderson-Burdick* test rests on *Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020), a case that did not involve the pandemic and does not help Defendants' position. *Luft* explains that *Anderson-Burdick* directs courts to "weigh" the burden on voters "against the state's interests by looking at the whole electoral system." *Id*. at 671-72. Defendants themselves, however, have already concluded that the "whole electoral system" warranted an extension of mail-in voting when they

---

Marion County Clerk observes, however, those numbers "could have been substantially reduced had the members of the Indiana Election Commission used their emergency powers to suspend a rigid application of that deadline." Dkt. 61-10, Ex. 10 ¶ 5; *see also* Dkt. 61-11, Ex. 11 ¶ 7 (noting that "as a percentage of total absentee ballots received," there was no increase in the number of late-arriving mail ballots in Lake County in the primary).

allowed all Hoosiers to vote by mail during the primary. Nothing has changed since then to make the burdens for Indiana voters any less severe. Consideration of Wisconsin's voting rules "as a whole" made particular sense in *Luft*, moreover, given that the case involved challenges to "more than a dozen" different statutory provisions, "each contested under a number of theories." *Id*. at 670.[6]

Likewise, *Griffin v. Roupas*, 385 F.3d 1128 (7th Cir. 2004), does not control here. While Plaintiffs agree that there is no constitutional right to vote by mail generally, Pls. Mem. 9, nothing in *Griffin* suggested that the Constitution would have no application to claims seeking to expand absentee voting in the face of a historic pandemic. Nor do Plaintiffs seek "unlimited" absentee voting. *Id*. at 1030. Rather, they seek to vote by mail—as Indiana voters were permitted to do in the June 2020 primary—in the upcoming general election.

### 2.   *McDonald* **Is Not To The Contrary.**

Defendants also claim (Resp. 10) that the Supreme Court rejected a "materially identical" challenge to absentee voting laws in a pre-*Anderson-Burdick* case, *McDonald v. Board of Election Commissioners of Chicago*. That is flatly incorrect. *McDonald* is materially different from this case in a number of ways. It held—at summary judgment—that it was not a denial of equal protection for Illinois to allow "medically incapacitated" persons to vote by mail without allowing incarcerated persons to do the same. But the Court stressed that there was "nothing in the record to indicate that the Illinois statutory scheme has an impact on appellants' ability to exercise the fundamental right to vote" because the inmates

---

[6] Defendants also seize on *Luft*'s observation that Wisconsin has "lots of rules that make voting easier," 963 F.3d at 672, claiming that the same is true for Indiana. But the two features they identify will not help those worried about COVID to cast their vote safely in November. Resp. 17 (discussing the statutory allowance for in-person voting centers and the availability of online voter registration and assistance). Defendants also assert that Indiana saw 85% registered voter turnout in the general election in November 2016. Resp. 17-18. But the Secretary of State's own webpage says that turnout in that election was 58%. *See* Dkt. 61-13, Ex. 13, *General Election Turnout and Registration*, https://www.in.gov/sos/elections/files/2016_General_Election_Turnout.pdf. In any event, Plaintiffs do not challenge Indiana's voting rules in 2016. Turnout in that election says nothing about the burden voters will face if they are required to go into polling places in November 2020 during an unprecedented pandemic.

had not adduced evidence that the State refused to provide other means, short of mail-in ballots, to alleviate their burden. 394 U.S. at 807. The Court therefore applied "traditional standards for evaluating appellants' equal protection claims" and concluded that it was reasonable for the Illinois Legislature to treat unsentenced inmates differently from other classes of voters. *Id*. at 808-809.

This case is fundamentally different from *McDonald*. The State's refusal to permit no-excuse mail-in voting in the general election forces Hoosiers to choose between risking their health or giving up their right to cast a ballot. For those voters, there are no alternatives to mail-in voting that will adequately address their legitimate safety concerns. Thus, in the context of the COVID pandemic, it is undeniable that Indiana's statutory scheme has an impact on the right to vote. The refusal to apply the same mail-in voting rules the State applied during the June primary forces voters to trade off their health against their right to vote—a trade-off no prisoner in *McDonald* had to make. The Constitution does not permit States to impose such a burden absent a compelling justification, which is wholly lacking here.[7]

Defendants point out that *Texas Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020), reached the opposite conclusion, but that case was incorrectly decided. As an initial matter, *Abbott* arose in a very different state-law context. The Texas State Attorney General had issued an opinion construing Texas's statute allowing voters with a "disability" to vote by mail as *not* authorizing all voters who lack immunity to COVID-19—*i.e.*, voters generally—to do the same. *Id*. at 394-95. Subsequently, the Texas Supreme

---

[7] Defendants mischaracterize later authority interpreting *McDonald*, which they say "reiterates . . . that heightened scrutiny applies *only* when a citizen is 'in fact *absolutely prohibited* from voting *by the State*." Resp. 13 (emphasis in original). But the Sixth Circuit has held that "Plaintiffs [do] not need to show that they were legally prohibited from voting," "only that 'burdened voters have few alternate means of access to the ballot.'" *Obama for America v. Husted*, 697 F.3d 423, 431 (6th Cir. 2012). And the Second Circuit has found it sufficient that "there is at least some burden on the voter-plaintiffs' rights" that made it "difficult to vote in person." *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 109 & n.9 (2d Cir. 2008). Recently, in *Thomas v. Andino*, *supra*, the court explicitly rejected Defendants' reading of *McDonald*, explaining that "the standard does not require this court to find that the state has 'absolutely prohibited voting'" and that it is enough that "[i]n-person voting, while still technically an available option, forces voters to make the untenable and illusory choice between exercising their right to vote and placing themselves at risk of contracting a potentially terminal disease." 2020 WL 2617329, at *17 n.20.

Court affirmed the Attorney General's interpretation. *In re State*, 2020 WL 2759629 (Tex. May 20, 2020). Here, the IEC has already interpreted the term "voter with disabilities" in Indiana's statute providing for mail-in voting to encompass voters who are unable to vote safely due to the pandemic. Dkt. 53-8 at 4.

In any event, the Fifth Circuit misunderstood *McDonald* to require rational-basis review unless a plaintiff could show that he or she has been "absolutely prohibited" from voting. That reading is incompatible with *Anderson-Burdick*'s sliding-scale rule. *See supra* n.7. Further, in a footnote, the Fifth Circuit conceded that elsewhere in *McDonald* the Supreme Court "state[d] the rule a bit differently," referring to whether the "statutory scheme has an impact" on the plaintiffs' ability to vote. *Abbott*, 961 F.3d at 405 n.30. While the Fifth Circuit said there was no difference between the two formulations— because "Texas's decision to allow those aged sixty-five and older to vote by mail does not 'impact' the plaintiffs' ability to vote," *id.*—that blinks reality. For purposes of the Fourteenth Amendment, what impacts Plaintiffs' and other Hoosiers' ability to vote during a global pandemic is not the State's decision to allow 65 year-olds to vote by mail, but the decision *not to allow others* to vote by mail too.

**B.     Plaintiffs Are Likely To Succeed On Their Twenty-Sixth Amendment Claim.**

Plaintiffs' challenge to Indiana's absentee voting scheme is likely to succeed for a second, independent reason. Indiana allows those 65 and older to vote by mail with no excuse but withholds that right from those 64 and younger. The Twenty-Sixth Amendment is unambiguous: "The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. Const. amend. XXVI § 1.

Plaintiffs' opening brief explains why Defendants' refusal to grant voters under age 65 the right to vote by mail without excuse, while permitting those 65 and older to do so, "abridge[s]" Plaintiffs' right to vote "on account of age" in violation of the plain language of the Twenty-Sixth Amendment. Pls. Mem. 16-20. Mischaracterizing Plaintiffs' facial challenge as an "as applied" challenge, Resp. 9, Defendants' perfunctory two-page response tries to sidestep Plaintiffs' argument by relying on two

13

erroneous propositions.[8] Resp. 18-19. First, Defendants suggest that the Supreme Court's decision in *McDonald*—applying the rational basis standard of the Equal Protection Clause of the *Fourteenth* Amendment—governs challenges to age-based voting classifications under the *Twenty-Sixth* Amendment. That is obviously wrong. *McDonald* cannot possibly control the Twenty-Sixth Amendment analysis because the Twenty-Sixth Amendment had not been adopted when *McDonald* was decided, and in any case *McDonald* did not implicate a voting restriction based on a criterion expressly prohibited by one of the other "voting amendments" (the Fifteenth, Nineteenth, and Twenty-Fourth). Defendants' second error is to treat an "abridgment" of the right to vote as no different from an outright "denial" of the right to vote, even though both terms are used in the Twenty-Sixth Amendment (and the other voting amendments) and cannot mean the same thing.

**1.** *McDonald*. As discussed above, in *McDonald*, the Supreme Court refused to apply "exacting judicial scrutiny" to Illinois's absentee-voting provisions because "the distinctions made by Illinois'[s] absentee provisions are not drawn on the basis of wealth or race" (classifications that are impermissible under the Twenty-Fourth and Fifteenth Amendments) and because "there is nothing in the record to indicate that the Illinois statutory scheme has an impact on appellants' ability to exercise the fundamental right to vote." 394 U.S. at 807. But while the extent of the burden on voting may be relevant in an analysis under the Fourteenth Amendment, cases involving voting rights under the Constitution's specific voting amendments make clear that those amendments prohibit *any* burden "on account of" race, sex, poll-tax payment, or age. *See Harman v. Forssenius*, 380 U.S. 528, 542 (1965) ("*Any* material requirement" based "solely" on declining to pay a poll tax "subverts the effectiveness of the Twenty-Fourth Amendment and must fall under its ban") (emphasis added); *Lane v. Wilson*, 307 U.S. 268, 275 (1939) (the Fifteenth Amendment bars "onerous procedural requirements which effectively handicap exercise of the

---

[8] Plaintiffs challenge the age-based restrictions on mail-in balloting contained in Ind. Code § 3-11-10-24(a) as unconstitutional on their face, Am. Compl. ¶ 92, and as applied during the ongoing COVID-19 pandemic, *id.* ¶ 94.

franchise"—in that case, by black voters—"although the abstract right to vote may remain unrestricted as to race"); *Jolicoeur v. Mihaly*, 488 P.2d 1, 2 (Cal. 1971) ("treat[ing] minor citizens differently from adults for any purpose related to voting" violates the Twenty-Sixth Amendment). *McDonald's* Fourteenth Amendment analysis of restrictions on prisoners' ability to vote—and its use of the "rational basis" standard—does not apply to the Twenty-Sixth Amendment, which establishes that *no* "abridg[ment]" of the right to vote "on account of age" is permitted.[9]

Defendants' reliance on the Fifth Circuit's decision in *Abbott* is likewise misplaced. Relying on *McDonald*, the Court in *Abbott* concluded that Texas's decision "to give only some of its citizens the option to vote by mail . . . does not itself 'deny' the plaintiffs 'the exercise of the franchise.'" 961 F.3d at 403-404 (quoting *McDonald*). Thus, according to the court, "[b]ecause the plaintiffs' fundamental right is not at issue, *McDonald* directs us to review only for a rational basis[.]" *Id*. at 406. That analysis does not take into account that the plain language of the Twenty-Sixth Amendment prohibits *both* an outright denial of the right to vote *and* any abridgment of that right. Like the Twenty-Sixth Amendment, each of the other so-called "voting amendments" expressly applies both to a denial of the right to vote and an abridgment of that right.[10] As *Harman*, *Lane*, and *Jolicoeur* make clear, state requirements that abridge, but do not completely deny, the voter's ability to cast a ballot based on criteria proscribed by the voting amendments are unconstitutional. *See*, *e.g.*, *Harman*, 380 U.S. at 540-541 ("[T]he Twenty-fourth Amendment does not merely insure that the franchise shall not be 'denied' by reason of failure to pay the poll tax; it expressly guarantees that the right to vote shall not be 'denied or abridged' for that reason. Thus, like the Fifteenth

---

[9] Unlike voting restrictions based on race, sex, wealth, or age, there is no express constitutional prohibition on abridgment of a prisoner's right to vote.

[10] *See* U.S. Const. amend. XV ("The right . . . to vote shall not be denied or abridged . . . on account of race, color, or previous condition of servitude"); *id*. amend. XIX ("The right . . . to vote shall not be denied or abridged . . . on account of sex"); *id*. amend. XXIV ("The right . . to vote . . . shall not be denied or abridged . . . by reason of failure to pay any poll tax or other tax").

Amendment, the Twenty-fourth 'nullifies sophisticated as well as simple-minded modes' of impairing the right guaranteed.") (quoting *Lane*, 307 U.S. at 275).

Defendants rely (Resp. 19) on the Fifth Circuit's unsupported assertion in *Abbott* that, even though *McDonald* was decided before the Twenty-Sixth Amendment, the "logic" of *McDonald's* Fourteenth Amendment analysis—in particular its use of the rational basis test—"applies equally to the Twenty-Sixth Amendment claim" challenging Texas's absentee-voter law. *See Abbott*, 961 F.3d at 408. But that conclusion cannot be squared with the very different language of the voting amendments, which specifically identify classifications that cannot be used to deny or abridge the right to vote. There have been no need for a constitutional amendment forbidding discrimination in voting "on account of age" if the Equal Protection Clause could be read to protect the voting rights of those 18 or older from such discrimination. *See Walgren v. Bd. of Selectmen of Town of Amherst*, 519 F.2d 1364, 1367 (1st Cir. 1975) (it is "difficult to believe" that the Twenty-Sixth Amendment "contributes no added protection to that already offered by the Fourteenth Amendment" with respect to voting).

In short, by virtue of the Twenty-Sixth Amendment, for purposes of voting, "age" is now a classification like race or sex: a state can no more adopt classifications that discriminate against a voter over the age of 18 on the basis of "age" than it can discriminate against her on the basis of "race, color, or previous condition of servitude" (amend. XV § 1), "sex" (amend. XIX), or failure to pay a poll tax (amend. XXIV). The Fourteenth Amendment's rational basis test is not applicable to determine if the "right to vote" has been "denied or abridged" under the Twenty-Sixth Amendment by Indiana's decision that only voters 65 or older may avail themselves of no-excuse voting by mail. *Abbott* thus is wrong, and Defendants' reliance on it is misplaced.[11]

---

[11] In *Luft*, the Seventh Circuit appeared to approve of the district court's "treat[ing] arguments under the Twenty-Sixth Amendment (for age) the same as those under the Fifteenth Amendment (for race)." 963 F.3d at 673. The Seventh Circuit thus would likely hold that a facial age-based restriction is

**2.** <u>Abridgment.</u> The voting amendments prohibit the "abridgment" of the right to vote based on certain criteria, including age. To "abridge" is to "shorten" or "reduce in scope." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/abridge (visited July 26, 2020). An abridgment of the right to vote occurs when a state imposes "procedural requirements, which effectively handicap exercise of the franchise," even if "the abstract right to vote" remains "unrestricted." *Jolicoeur,* 488 P.2d at 4 (noting that the Twenty-Sixth Amendment mirrors the language of the "Twenty-Fourth, Nineteenth, and Fifteenth before it") (quoting *Lane*, 307 U.S. at 275). Defendants nevertheless contend that Indiana does not "abridge" Plaintiffs' right to vote, only the right to vote by absentee ballot. Resp. 19.

Abridgment "necessarily entails a comparison." *Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 334 (2000). Compared to the right to vote that Indiana provides its citizens 65 and older, the right it provides to younger voters is less robust—voters under 65 need a specific excuse to vote by mail, while older voters do not. In other words, the right of younger voters is "abridged" solely on account of the voters' age, a criterion that is expressly forbidden by the Twenty-Sixth Amendment. *See Harman*, 380 U.S. at 542 (construing the Twenty-Fourth Amendment). If Indiana permitted men to vote by mail, but required women to meet certain requirements before they could vote by mail, no one would doubt that that scheme would constitute an unconstitutional abridgment under the Nineteenth Amendment. Likewise if the distinction were based on race under the Fifteenth Amendment. Because Indiana's mail-in ballot restrictions are expressly based on age—like race and sex, a forbidden criterion that cannot be used as a basis for differential treatment under the voting amendments—Indiana's age-based voting restrictions for mail-in ballots violate the Twenty-Sixth Amendment on its face.

---

unconstitutional, or at least subject to the strictest scrutiny. *Luft* found no Fifteenth Amendment violation based on discriminatory *impact* theories, *id*. at 670-71, 674, but that is because the Wisconsin voting statutes—reducing the times available for early voting, for example—were all formally race (and age) neutral. Here, by contrast, the Indiana voting restriction is age-based on its face.

They also violate the Twenty-Sixth Amendment as applied. Even if Indiana's scheme does not constitute a facial violation of the Twenty-Sixth Amendment (and it surely does), there can be no serious question that requiring voters under age 65 to risk life-threatening infection by appearing at crowded polling places during a pandemic "reduces in scope"—and thus abridges—their right to vote. As *McDonald* itself made clear, an "exacting" standard of review *is* necessary when a distinction is based on classifications that are impermissible under the voting amendments. 394 U.S. at 807 (referring to the Twenty-Fourth and Fifteenth Amendments).

We have explained above how the burdens placed on Indiana voters by Indiana's age-based distinctions vastly outweigh any inconvenience to the State in permitting no-excuse mail voting for the general election, as it did for the primary. As the CDC has recognized, COVID poses serious risks to voters of all ages, not just those over 65. *See supra* n.3. Simply put, the State is forcing thousands of its citizens to choose between their health and their right to vote in a presidential election. Some may choose to take that risk; but none should be *required* to do so to exercise a fundamental right protected in a specific voting amendment. Whatever justification Defendants might assert in support of their discriminating against younger voters during a pandemic, at this preliminary stage Plaintiffs have shown that they are likely to prevail on their as-applied challenge under the Twenty-Sixth Amendment.

## II. Plaintiffs Have Satisfied Their Burden For A Preliminary Injunction.

As shown above, Plaintiffs have established a strong likelihood of success on the merits. Once a plaintiff has established a likelihood of success, the analysis turns to a "sliding scale," where even a "lesser likelihood of success" can be "made sufficient by a greater predominance of the balance of harms.'" *Jones v. McGuffage*, 921 F. Supp. 2d 888, 895 (N.D. Ill. 2013). Here, the balance tips decisively in Plaintiffs' favor. Defendants do not dispute that Plaintiffs will suffer an irreparable injury if they are denied the right to vote safely in the general election. Pls. Mem. 21-23. The IEC has already recognized that the balance favors "no excuse" mail-in voting, and none of the supposed issues Defendants raise with using that

approach in the November election change that conclusion. Indeed, the situation is going from bad to worse. Indiana's health commissioner has warned of a surge in cases this fall, and Governor Holcomb has acknowledged the worsening conditions by issuing a statewide mask order. *See supra* pp. 2-3 & 5.

On the other side of the ledger, Defendants posit a parade of horribles were this Court to grant an injunction. Opp. 20-24. These putative burdens fit generally under the rubric of administrative convenience; but no State may deprive citizens of their constitutional right to vote "because of some remote administrative benefit," *Carrington v. Rash*, 380 U.S. 89, 95 (1965), particularly where the challenged rule is not "in any sense necessary to the proper administration of its election laws." *Harman*, 380 U.S. at 542-43. Further, in cases involving significant public interest, courts may consider the balance of the equities and the public interest together, as "courts of equity may go to greater lengths to give 'relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.'" *FTC v. Credit Bureau, LLC,* 937 F.3d 764, 784 (7th Cir. 2019) (quoting *Virginian Ry. Co. v. Sys. Fed'n No. 40,* 300 U.S. 515, 552 (1937)). We are not living in normal times, and the public interest in this matter must be assessed through the prism of what has been called the "worst pandemic" the "planet has seen in over a century." *League of Women Voters*, 2020 WL 2158249, at *10. The extraordinary burdens caused by this pandemic may require court-ordered "reforms or modifications" in election procedures. *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1208 (2020). Moreover, the public interest is clearly served by a preliminary injunction that not only upholds constitutional rights but also helps safeguard public health by eliminating unnecessary in-person contacts and preventing COVID-19 transmission in public locations. *Cf. Cook Cnty. v. Wolf*, 962 F.3d 208, 234 (7th Cir. 2020) (affirming preliminary injunction against enforcement of a rule with potentially dire health consequences).

Finally, the claim that Defendants must be free to "recalibrat[e]" their approach to mail-in voting based on their "experience" and an "evolving" insight into how COVID-19 "impacts life in the public

forum" is empty rhetoric. Resp. 21. All of the relevant considerations that led the IEC to allow all voters to cast mail-in ballots in the primary still exist and have, if anything, grown more urgent. Meanwhile, the IEC has held no public meetings since May 12, 2020, has not met once since the June 2 primary, and has scheduled no meeting even to consider whether to extend its adoption of no-excuse absentee mail-in voting to the general election. Having refused to bring their "experience" to bear upon these matters, and with the number of days between now and the election dwindling rapidly, Defendants cannot credibly claim that there is some injustice in requiring them to act to ensure that all Indiana voters who want to safely cast their ballot in November are able to do so.

In light of the strength of Plaintiffs' case, Defendants' decision to allow no-excuse voting by mail for the primary, and the worsening pandemic, Plaintiffs have made a more than sufficient showing to warrant a preliminary injunction.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for preliminary injunction should be granted.

Dated: July 31, 2020

Gary A. Isaac (*pro hac vice*)
Jeffrey M. Strauss (*pro hac vice*)
Brett E. Legner (*pro hac vice*)
Jed W. Glickstein (*pro hac vice*)
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600
Email: gisaac@mayerbrown.com
Email: jstrauss@mayerbrown.com
Email: blegner@mayerbrown.com
Email: jglickstein@mayerbrown.com

    *Of Counsel*

Respectfully submitted,

*s/ William R. Groth*
William R. Groth, Of Counsel
MACEY SWANSON LLP
445 N. Pennsylvania St., Suite 401
Indianapolis, IN 46204
Tel: (317) 637-2345, Ext. 132
Email: WGroth@fdgtlaborlaw.com

*s/ Mark W. Sniderman*
Mark W. Sniderman, 26599-49
FINDLING PARK CONYERS WOODY
& SNIDERMAN, P.C.
151 N. Delaware Street, Ste. 1520
Indianapolis, IN 46204
(317) 231-1100 Tel
(317) 231-1106 Fax
Email: msniderman@findlingpark.com

    *Counsel for Plaintiffs*