UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BARBARA TULLY, KATHERINE BLACK, MARC BLACK, DAVID CARTER, REBECCA GAINES, ELIZABETH KMIECIAK, CHAQUITTA MCCLEARY, DAVID SLIVKA, DOMINIC TUMMINELLO, and INDIANA VOTE BY MAIL, INC., individually, and on behalf of those similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>PAUL OKESON, S. ANTHONY LONG, SUZANNAH WILSON OVERHOLT, and ZACHARY E. KLUTZ, in their official Capacity as members of the Indiana Election Commission, and CONNIE LAWSON, in her official capacity as the Indiana Secretary of State,<br><br>    Defendants. | Cause No. 1:20-cv-01271-JPH-DLP |

**BRIEF OF AMICI CURIAE INDIANA DISABILITY RIGHTS, INDIANA STATEWIDE INDEPENDENT LIVING COUNCIL, AMERICAN DIABETES ASSOCIATION, DISABILITY RIGHTS EDUCATION AND DEFENSE FUND, INC., AND THE DISABILITY RIGHTS LEGAL CENTER**

~1~

## INTEREST OF AMICI CURIAE[1]

**I.  Amici Curiae Are Indiana and National Organizations that Advocate for the Rights of People with Disabilities.**

Amicus curiae **Indiana Disability Rights** (IDR) is the federally-mandated and state-designated protection and advocacy organization for the state of Indiana. Located in Indianapolis, IDR's mission is to protect and promote the rights of individuals with disabilities through empowerment and advocacy. IDR provides advocacy services to individuals with all types of disabilities in support of their personal and civil rights, serving as their partner in rights issues and providing them with resources for self-advocacy. IDR also endeavors to bring awareness to society in order to eliminate discrimination.

IDR works under several federal programs including the Protection and Advocacy for Voting Access (PAVA) program, authorized by the federal Help America Vote Act (HAVA). HAVA acknowledges the unique obstacles people with disabilities face at the polls and, through PAVA, charges protection and advocacy organizations with helping to ensure the full participation of individuals with disabilities in the entire electoral process. IDR represents Hoosiers with disabilities in voting access matters, and regularly trains Indiana county clerks on poll accessibility. IDR also provides feedback to the Indiana Secretary of State about election access, including recently submitted comments in April 2020 to the Indiana Election Commission regarding necessary accommodations to the primary election for voters with disabilities. *See infra* notes 25, 28.

Amicus curiae **Indiana Statewide Independent Living Council** (INSILC), was established by the Rehabilitation Act of 1973, as amended. INSILC is a federally and state mandated, governor-appointed council, that is independent and autonomous from the State of Indiana. INSILC is a nonprofit organization led and directed by a majority of its peers with disabilities from all regions of Indiana with

---

[1] No counsel for a party authored this brief in whole or in part. No such counsel or party made a monetary contribution to fund the preparation or submission of this brief. No person other than amici and their counsel made any such monetary contribution. Amici are non-profit corporations or, in the case of Indiana Disability Rights, a governmental agency. They have no parent corporations and, as they have no stock, no publicly held company owns 10 percent or more of their stock.

different backgrounds and experiences, and is tasked with promoting the philosophy of Independent Living. This philosophy is deeply engrained in the belief that people with disabilities should have the same civil rights, choices, options, and control over their lives as do people without disabilities. INSILC's mission is to "empower our peers with disabilities to lead and control their own lives."

To ensure its Hoosier peers with disabilities are empowered to vote and to have control over the exercise of their right to vote, INSILC has stressed the importance of providing accommodations for the Hoosier disability community to remove unnecessary barriers to this right. Voting by mail is one such accommodation. INSILC believes voting by mail would eliminate barriers to the voting process for its peers with disabilities while protecting their health and safety during the COVID-19 public health emergency. Extending voting by mail to informal family caretakers and formal paid supports, such as direct support professionals or personal care attendants who provide services to Hoosiers with disabilities, would also lessen the exposure risk to Hoosiers with disabilities. Mitigating the exposure risk to these caretakers and paid supports could play a major role in the State of Indiana's efforts to reduce the transmission of the novel coronavirus to people with disabilities in their own homes and in the healthcare facilities where the majority of the COVID-19 related deaths have occurred in Indiana.

Amicus curiae **the American Diabetes Association** (Association) is a nationwide, nonprofit, voluntary health organization founded in 1940 made up of persons with diabetes, healthcare professionals who treat persons with diabetes, research scientists, and other concerned individuals. The Association's mission is to prevent and cure diabetes and to improve the lives of all people affected by diabetes. The Association is the largest non-governmental organization that deals with the treatment and impact of diabetes.[2] The Association reviews and authors the most authoritative and widely followed

---

[2] The Association has over 485,000 general members, over 15,000 health professional members and over 1,000,000 volunteers.

clinical practice recommendations, guidelines, and standards for the treatment of diabetes[3] and publishes the most influential professional journals concerning diabetes research and treatment.[4]

Among the Association's principal concerns is the equitable and fair treatment of people with diabetes. Over 650,000 Hoosiers have diabetes, 146,000 of whom have undiagnosed diabetes,[5] greatly increasing their health risk. In most cases, disenfranchisement is the result not of malice toward those with diabetes, but rather, is a product of misinformation, stereotypes, or lack of attention. Thus, the Association adds to the collective discussion aimed at bringing to this Court's attention the particular impacts of COVID-19 on the disability community, which includes those with diabetes, and to advocate for its Indiana members and their ability to vote without endangering their health.

Amicus curiae **Disability Rights Education and Defense Fund, Inc.** (DREDF) is a national nonprofit law and policy center dedicated to protecting and advancing the civil rights of people with disabilities. Founded in 1979 by people with disabilities and parents of children with disabilities, DREDF remains board- and staff-led by members of the disability community. DREDF pursues its mission through education, advocacy and law reform efforts, and is nationally recognized for its expertise in the interpretation of federal disability civil rights laws.

DREDF has significant experience with voting rights access issues over decades. DREDF was involved in the legislative process leading to the federal National Voter Registration Act of 1993, which authorized expanded voter registration options. DREDF provided party representation in the consolidated

---

[3] American Diabetes Association: Standards of Medical Care in Diabetes 2020, *Diabetes Care* 43: Supp. 1 (2020).

[4] The Association publishes five professional journals with widespread circulation: (1) *Diabetes* (original scientific research about diabetes); (2) *Diabetes Care* (original human studies about diabetes treatment); (3) *Clinical Diabetes* (information about state-of-the-art care for people with diabetes); (4) *BMJ Open Diabetes Research & Care* (clinical research articles regarding type 1 and type 2 diabetes and associated complications); and (5) *Diabetes Spectrum* (review and original articles on clinical diabetes management).

[5] Centers for Disease Control and Prevention (CDC), U.S. Diabetes Surveillance System, *Diagnosed Diabetes, Total, Adults with Diabetes, Number, Indiana*, https://gis.cdc.gov/grasp/diabetes/DiabetesAtlas.html# (last visited Aug. 10, 2020); Timothy M. Dall et al., *The Economic Burden of Elevated Blood Glucose Levels in 2017: Diagnosed and Undiagnosed Diabetes, Gestational Diabetes Mellitus, and Prediabetes*, 42 DIABETES CARE 1661, 1666 (Sept. 2019).

cases *American Association of People with Disabilities (AAPD) v. Shelley*, Civ. No. 04-1526 (C.D. Cal.), and *AAPD v. Benevidez*, Civ. No. 04-3318 (C.D. Cal), which catalyzed the State of California's decision to prioritize acquisition of voting technology that offered safe and independent access for voters with visual and manual dexterity impairments. From 2004 to 2010, DREDF participated in the California Voter Empowerment Circle (CalVEC), an ad hoc coalition of organizations committed to encouraging full civic participation by historically disenfranchised communities. The *AAPD* party litigation and CalVEC work was undertaken in collaboration with the Disability Rights Legal Center, which also joins this amicus brief. While past work was undertaken in California, it involved voting access issues of relevance throughout the United States. Such issues now include ensuring full and safe access to voting during the COVID-19 pandemic.

Amicus curiae the **Disability Rights Legal Center** (DRLC) is a non-profit legal organization founded in 1975 to represent and serve people with disabilities. Individuals with disabilities continue to struggle against ignorance, prejudice, insensitivity, and lack of legal protection in their endeavors to achieve fundamental dignity and respect. The DRLC assists people with disabilities in attaining the benefits, protections, and equal opportunities guaranteed to them under the Rehabilitation Act of 1973, the Americans with Disabilities Act, the Individuals with Disabilities Education Act, and other state and federal laws. Its mission is to champion the rights of people with disabilities through education, advocacy, and litigation. The DRLC is a recognized expert in the field of disability rights.

The DRLC was previously known as the Western Law Center for Disability Rights, and past voting access work under that name included party counsel participation in the consolidated *AAPD* party litigation and the CalVEC work that is detailed in the statement of interest for DREDF, which also joins this amicus brief. The DRLC's nondiscrimination work includes advocacy to ensure that voters with disabilities, including disproportionately vulnerable seniors and those with underlying medical conditions, are not forced to risk their health in order to cast a ballot.

**II.     Amici Seek to Ensure that Hoosiers with Disabilities, and Those Who Live with and Provide Care to Them, Have Meaningful and Safe Access to the Vote during the Pandemic.**

This case is about whether Indiana voters will have safe and adequate access to voting during a general election happening in the midst of a pandemic. Ensuring this access is an issue of special concern to the amicus parties joining this brief. No Hoosier should have to choose between risking infection with a potentially deadly virus and casting their ballot. And Hoosiers with disabilities are particularly vulnerable to the virus.

As 501(c)(3) organizations, the amici joining this brief do not support or oppose any political party or any candidates for political office.[6] Indeed, people with disabilities tend to split their votes between the political parties.[7] Nor do amici support the Plaintiffs or the Defendants in this litigation. Amici's interest in this matter is limited to ensuring that people with disabilities, as well as the people who live with or care for them, have meaningful and safe access to the vote during the pandemic. The lives and votes of Hoosiers with disabilities are equally valuable to those of Hoosiers without disabilities. Given the unique vulnerability of people with disabilities when it comes to COVID-19, their lives and votes should be considered in this case.

## ARGUMENT

The vote-by-mail statute at issue in this case allows "voter[s] with disabilities" to vote by mail, but does not define that phrase. *See* Ind. Code § 3-11-10-24(a)(4). The parties to this litigation appear to agree that the individual Plaintiffs and putative class members do not qualify to vote by mail as voters "with disabilities" as that phrase is used in the statute. But the Court may create confusion if it were to accept the parties' representations on the issue of who is a "voter with disabilities" and should thus take care. Consistent with federal laws covering Indiana elections, this Court should consider "voter[s] with

---

[6] Amicus curiae IDR is not a 501(c)(3) organization; it is an agency of the State of Indiana. As such, it likewise does not support or oppose any political party or any candidates for political office.

[7] Abigail Abrams, *Voter Turnout Surged Among People with Disabilities Last Year. Activists Want to Make Sure that Continues in 2020*, TIME (July 10, 2019), https://time.com/5622652/disability-voter-turnout-2020/.

disabilities" to include any voter with a disability under the Americans with Disabilities Act (ADA), as amended in 2008.

Under the ADA, individuals who are substantially limited in interacting with others due to a physical or mental impairment have a covered "disability." During COVID-19, this includes any Indiana voter who is advised to avoid contact with others due to any pre-existing condition. Restricting access for these voters to Indiana's vote-by-mail program would violate the ADA. Similarly, given the manner in which the coronavirus is spread, Hoosiers who live with people with disabilities, as well as those who do not live them but who provide care for them, have the same need to vote by mail as disabled voters. Those voters are similarly situated during the pandemic to Hoosiers with disabilities because of the imperative to safeguard the health of the Hoosiers with disabilities with whom they live or for whom they provide care. It does little for disabled voters to permit them to vote safely by mail, but to require their household members or caregivers to vote in unsafe settings and then return to the homes of disabled voters. Extending absentee voting to *all* registered Indiana voters, as was done during the June primary election, will avoid legal pitfalls and help protect the lives and votes of Hoosiers with disabilities.

I. **Hoosiers with Disabilities Are at Increased Risk for Serious Illness and Death as a Result of COVID-19.**

   a. **Certain Health Conditions Greatly Increase the Risk of Serious Illness and Death from COVID-19.**

Everyone is at risk for getting COVID-19 if they are exposed to the virus that causes it. But some people are more likely than others to become severely ill, which means that they may require hospitalization, intensive care, or a ventilator to help them breathe, or they may even die. Examples include people with lung disease, asthma, heart conditions, diabetes, kidney disease, or liver disease, people who are immunocompromised, and higher weight people.[8]

---

[8] CDC, *People With Certain Medical Conditions*, Coronavirus Disease 2019 (COVID-19), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (updated July 30, 2020) (listing conditions that increase the risk of severe illness from COVID-19).

It is now well established that for people with these and other health conditions, the risk of serious illness and death from the virus that causes COVID-19 is much higher than for the general U.S. population. In the United States, people with underlying health conditions are six times more likely to be hospitalized and 12 times more likely to die as a result of infection with the virus.[9] More than four out of five people under age 65 who died in the U.S. from COVID-19 had one or more of these conditions. Among COVID-19 decedents of all ages, 60.9 percent had cardiovascular disease, 39.5 percent had diabetes, 20.8 percent had chronic kidney disease, and 19.2 percent had chronic lung disease. Half of COVID-19 decedents under 65 had diabetes (either type 1 or type 2), which is more than twice the prevalence of diabetes in the general U.S. population.[10]

### b.  These Health Conditions Are Themselves Disabilities under the ADA.

"Disability" is construed very broadly under the ADA. *See* 42 U.S.C. § 12102(4)(A) (the definition of disability in the ADA "shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act"); *see also Makeda-Phillips v. Ill. Sec'y of State,* No. 12-3312, 2014 U.S. Dist. LEXIS 15971, at *18 (C.D. Ill. Feb. 10, 2014) (although their "impairment must 'substantially limit' a major activity for an individual to be considered disabled" under the ADA, that term "should be broadly construed in favor of expansive coverage").[11] For example,

---

[9] CDC, *Coronavirus Disease 2019 Case Surveillance – United States, January 22–May 30, 2020*, Morbidity and Mortality Weekly Report (MMWR) (June 19, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6924e2.htm.

[10] CDC, *Characteristics of Persons Who Died with COVID-19 — United States, February 12–May 18, 2020*, Morbidity and Mortality Weekly Report (MMWR) (July 17, 2020) https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6928e1-H.pdf. The list of relevant health conditions and how they interrelate with COVID-19 is constantly evolving in response to new medical information regarding the disease. *See Busby v. Bonner*, No. 20-cv-2359-SHL, 2020 U.S. Dist. LEXIS 102132, at *16, n.7 (W.D. Tenn. June 10, 2020); CDC, *supra* note 8 ("We are learning more about COVID-19 every day, and as new information becomes available, CDC will update [its] information").

[11] In 2008, in response to restrictive appellate and high court decisions, Congress clarified the intended broad scope of the federal civil rights definition of "disability." *See* ADA Amendments Act of 2008, Pub. L.110-325, 122 Stat. 3553 (Sept. 25, 2008) (an express legislative override of *Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184 (2002), *Sutton v. United Airlines*, 527 U.S. 471 (1999) and companion cases). The ADAAA specified that "it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their

disability under the ADA is to be assessed without regard to mitigating measures such as medications, prosthetics, hearing aids, or other devices (42 U.S.C. § 12102(4)(E)(i); 29 C.F.R. § 1630.2(j)(1)(vi)), and for conditions that are episodic or in remission, disability is assessed in the condition's active state, when the symptoms are at their worst (42 U.S.C. § 12102(4)(D); 29 C.F.R. § 1630.2(j)(1)(vii)). Moreover, "[m]ultiple impairments that combine to substantially limit one or more of an individual's major life activities also constitute a disability." 29 C.F.R. Pt. 1630, app. § 1630.2(j)(I)(ii).

Under this expansive federal civil rights definition of "disability," all of the health conditions increasing the risk of serious illness or death from COVID-19 (including all of those described in Part I.a., *supra*) are – in and of themselves – "disabilities" for purposes of the ADA and similar laws.[12] More than 25 percent of Hoosiers have disabilities, including many who have conditions that make them COVID-vulnerable.[13] Among those are 512,000 Hoosiers who have diagnosed diabetes, and an

---

obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis . . .." Pub. L. 110-325, § 2(b)(5), 122 Stat. 3554.

[12] *See Busby v. Bonner*, No. 20-cv-2359-SHL, 2020 U.S. Dist. LEXIS 102132, at \*\*17-18, 25-26 (W.D. Tenn. June 10, 2020) (finding that the following COVID-vulnerable people are individuals with disabilities under federal law: people with chronic lung disease or moderate to severe asthma (including chronic obstructive pulmonary disease (COPD) (including emphysema and chronic bronchitis), idiopathic pulmonary fibrosis and cystic fibrosis); people with serious heart conditions (including heart failure, coronary artery disease, congenital heart disease, cardiomyopathies and pulmonary hypertension); people who are immunocompromised (including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications); people with diabetes; people with chronic kidney disease undergoing dialysis; people with chronic liver disease, including cirrhosis; and people with hemoglobin disorders, including sickle cell disease and thalassemia); *Faour Abdallah Fraihat v. United States Immigration & Customs Enf't*, No. EDCV 19-1546 JGB (SHKx), 2020 U.S. Dist. LEXIS 72015, at \*\*50-51 & n.21, 78 (C.D. Cal. Apr. 20, 2020) (certifying class, granting injunctive relief, and finding that that people with the following medical conditions posing COVID risks are likely individuals with disabilities under the Rehabilitation Act: cardiovascular disease (congestive heart failure, history of myocardial infarction, history of cardiac surgery); high blood pressure; chronic respiratory disease (asthma, chronic obstructive pulmonary disease including chronic bronchitis or emphysema, or other pulmonary diseases); diabetes; cancer; liver disease; kidney disease; autoimmune diseases (psoriasis, rheumatoid arthritis, systemic lupus erythematosus); severe psychiatric illness; history of transplantation; and HIV/AIDS).

[13] CDC, *Disability & Health U.S. State Profile Data for Indiana (Adults 18+ years of age)*, Disability and Health Promotion (Sept. 12, 2019), https://www.cdc.gov/ncbddd/disabilityandhealth/impacts/indiana.html.

additional 146,000 Hoosiers with undiagnosed diabetes – together, almost 13 percent of the Indiana population.[14] For these Hoosiers with disabilities, reducing contact with people outside their households and otherwise limiting possible exposure to the virus are the only effective means to avoid serious illness.[15] Indeed, they and the people who live with them are advised to "limit [their] interactions with other people as much as possible."[16]

Given the risk of infection from being in close proximity with another person, there is a new interplay between a disabled person's pre-existing impairments – which may greatly increase their risk of severe illness or death from the virus – and the circumstances of everyday life. For people with disabilities, there are now greater limitations on their major life activities and consequently a need for new types of accommodations. As explained in *Harry B Silver v. City of Alexandria*, No. 1:20-CV-00698, 2020 U.S. Dist. LEXIS 119359 (W.D. La. July 6, 2020), the realities of COVID-19 shape the analysis:

> We find easily that [the plaintiff] has a qualifying disability. That results, in substantial part, from the existence of the COVID-19 pandemic in our nation, and the existence of his obvious co-morbidities [advanced age plus aortic valve disease and systolic heart failure]. Defendants argue that he is not entitled to claim those disabilities BECAUSE they are only COVID-related. In other words, because his disabilities are only situational, he cannot avail himself of the accommodations provided for by the ADA/RA. Such an argument fails, however, because of the simple and logical explanation of things the way they are. Neither the ADA nor the Rehabilitation Act contain any language to limit application to certain environmental or health-related situations. It makes complete sense to say that any application of these laws to these facts must be based upon a factual analysis that considers the totality of [the plaintiff's] health circumstances in conjunction with one's social circumstances. Call it a totality of the circumstances evaluation. The determination of a qualifying disability in this case cannot be looked at in a vacuum. . .. In sum, consideration of [the plaintiff's] documented serious underlying medical situation, in light of the pandemic's existence, is the proper way to make the disability determination here.

---

[14] Dall, *supra* note 5 at p. 1666 (Table 2, "State-level prevalence of diabetes and prediabetes, 2017, in thousands (prevalence rate %)").

[15] CDC, *How to Protect Yourself and Others*, Coronavirus 2019 (COVID-19), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fwhat-you-can-do.html (updated July 31, 2020) ("The virus is thought to spread mainly from person-to-person.").

[16] CDC, *supra* note 8.

*Id*. at **1, 3, 9-10, 17-18 (emphasis in original; granting plaintiff's requested accommodations).

## II. Indiana Voters with Disabilities Are Entitled to Modifications to Indiana's Voting Program that Address the Realities of Voting during the Pandemic.

The ADA and other federal laws guarantee voters with disabilities full and equal opportunities to vote.[17] Title II of the ADA applies to any "public entity" (42 U.S.C. § 12132), which includes any state or local government, and any of their departments, agencies or instrumentalities. 42 U.S.C. § 12131(1). Under Title II, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such an entity." 42 U.S.C. § 12132. As a program or activity of a state or local entity, voting is covered by Title II. *Cal. Council of the Blind v. County of Alameda*, 985 F. Supp. 2d 1229, 1234-35, 1238 (N.D. Cal. 2013). If a public entity denies people with disabilities meaningful access to its voting program, then it must make modifications or accommodations to its program accordingly. *See* 28 C.F.R. § 35.130(b)(7)(i) (requiring a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability"); *Disabled in Action v. Bd. of Elections*, 752 F.3d 189, 197, 199 (2d Cir. 2014) (Title II requires a public entity to provide people with disabilities with "meaningful access" to its voting program, which may in turn require "'reasonable accommodations'" in the program).

Under this body of law, voters with disabilities are entitled to receive voting-related accommodations that address the realities of the COVID-19 pandemic. *See Drenth v. Boockvar*, No. 1:20-CV-00829, 2020 U.S. Dist. LEXIS 92046, at **1, 14-15 (M.D. Pa. May 27, 2020) (blind plaintiffs seeking accessible ballots, enabling them to vote privately and independently from home, established the requisite irreparable injury because the absence of appropriate accommodations during the pandemic would burden their constitutional right to vote). Simply put, during this pandemic, voting policies cannot

---

[17] *See generally* U.S. Department of Justice, Civil Rights Division, Disability Rights Section, *The Americans with Disabilities Act and Other Federal Laws Protecting the Rights of Voters with Disabilities* (Sept. 2014), https://www.ada.gov/ada_voting/ada_voting_ta.htm.

place anyone with disabilities in the "'impossible bind' of either forfeiting their right to vote privately and independently or risking their health and safety by traveling to a polling place to vote in person." *See id.* at **5, 15; *see also People First of Ala. v. Merrill*, No. 2:20-CV-00619-AKK, 2020 U.S. Dist. LEXIS 104444, at **69-72 (N.D. Ala. June 15, 2020); stay denied by *People First of Ala. v. Merrill*, No. 20-12184, 2020 U.S. App. LEXIS 19850 (11th Cir. June 25, 2020); stay granted by *Merrill v. People First of Ala.*, No. 19A1063, 2020 U.S. LEXIS 3541 (U.S. July 2, 2020) (in finding "a prima facie case of disability discrimination relating to" an Alabama law requiring voters to submit a copy of their photo ID with their absentee ballot "as applied in the COVID-19 pandemic," noting that although "the interplay between the COVID-19 public health emergency and voting requirements is novel, district courts who have considered the issue have found that requiring a voter to risk her health . . . presents a 'nearly insurmountable hurdle'").

An opportunity to vote that requires people with disabilities, who as a group are more vulnerable to the coronavirus, to risk their health is not "as effective as" or "equal to" the same opportunity granted to others without disabilities who are not as vulnerable. 28 C.F.R. §§ 35.130(b)(1)(ii) (a public entity providing an aid, benefit or service may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit or service that is not equal to that afforded others"), 35.160(b)(1) ("A public entity shall furnish appropriate auxiliary aids and services when necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program or activity").

Even when steps are taken to reduce the risk of infection, in person voting increases the likelihood of coming into contact with the virus: voters wait in line, they communicate with election officials, and they use shared objects.[18] Aware of these risks, people with disabilities may choose to skip

---

[18] CDC, *Considerations for Election Polling Locations and Voters: Interim Guidance to Prevent Spread of Coronavirus Disease 2019 (COVID-19)*, Coronavirus Disease 2019 (COVID-19), https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (updated June 22, 2020).

voting altogether unless action is taken to make voting safe and accessible for them. *See Paher v. Cegavske*, No. 3:20-CV-00243-MMD-WGC, 2020 U.S. Dist. LEXIS 76597, at **6, 21 (D. Nev. Apr. 30, 2020) (without a plan to mail absentee ballots to all active registered voters during the pandemic, "voters worried about risks to their health or unsure about how to obtain an absentee ballot may very well be discouraged from exercising the right to vote all together").

### III. Plaintiffs and Members of the Putative Class Include People with Disabilities Who Are Entitled to Vote by Mail or to Other Accommodations that Ensure Safe Access to the Vote during the Pandemic.

On its face, Ind. Code § 3-11-10-24(a)(4) purports to allow voters with disabilities to vote by mail.[19] And the parties appear to agree that the individual Plaintiffs and the putative class that they represent are not voters "with disabilities" for purposes of that statute. Each of the Plaintiffs states that they "do not suffer from any condition that disables [them] from performing most of the activities of daily living." [Filing Nos. 13-1–13-3; 13-5; 13-6; 13-8–13-10; 13-12 (¶ 4 of each individual plaintiff's declaration).] The class is defined to include only those voters "who are not entitled to vote by mail because they do not satisfy any of the criteria of Ind. Code § 3-11-10-24(a)(1)-(13)," which includes the "voter with disabilities" provision of that statute. [Filing No. 18, p. 5.] Defendants apparently do not consider Plaintiff Marc Black, who is immunocompromised and has sarcoidosis and polycystic kidney disease [Filing Nos. 13-5, ¶ 2; 53-9, p. 16], to be a "voter with disabilities" under Ind. Code § 3-11-10-24(a)(4). [*See* Filing No. 50, pp. 5-6 (Defendants' opposition to the motion for class certification, indicating that the "Plaintiffs who are immunocompromised" are members of the putative class that is defined as Indiana voters "who are not entitled to vote by mail because they do not satisfy any of the criteria" of Ind. Code § 3-11-10-24(a) (1)-(13)).]

---

[19] The phrase "voter with disabilities" is not defined in Ind. Code § 3-11-10-24(a)(4). Amici are not aware of any Indiana decision interpreting that phrase for purposes of that statute. However, Ind. Code § 3-5-2-50.2 defines the phrase to mean "a voter who has a permanent or temporary physical disability, as set forth in 52 U.S.C. 20107." *See* 52 U.S.C. 20107(4) (provision of the 1984 Voting Accessibility for the Elderly and Handicapped Act defining "handicapped" as "having a temporary or permanent disability").

Nonetheless, as discussed *supra* in Part I.b., given the ADA's very broad definition of "disability" as well as the realities of the pandemic, some of the Plaintiffs and putative class members are voters "with disabilities" under laws protecting the rights of people with disabilities even if they are not considered to be so under Indiana's vote-by-mail statute. [*See, e.g.,* Filing Nos. 13-5, ¶ 2 (Plaintiff Marc Black has a compromised immune system), 13-10, ¶ 2 (Plaintiff Rebecca Gaines is a COVID-19 survivor).] As "qualified individual[s] with a disability," these Plaintiffs and putative class members cannot "be excluded from participation in or be denied the benefits of" voting by mail in the November 2020 general election even if they may not qualify to vote by mail under Ind. Code § 3-11-10-24(a). *See* 42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity").

It is not enough for Indiana to provide *some* Hoosiers with disabilities with *some* access to voting. Instead, Indiana must provide "equal" and "meaningful access to private and independent voting" and must do so for *all* of its voters with disabilities. *Cal. Council of the Blind*, 985 F. Supp. 2d at 1238; *see also Reyes v. Dart*, No. 17 C 9223, 2019 U.S. Dist. LEXIS 71320, at *22 (N.D. Ill. Apr. 29, 2019) (the public entity must allow "not just some access, but 'equal' access . . . to the service, program or activity in question" and "'meaningful access to a public entity's services, not merely limited participation'"); *Dunmore v. Shicker*, No. 3:16-CV-171-MAB, 2020 U.S. Dist. LEXIS 2155, at *38 (S.D. Ill. Jan. 7, 2020) (Title II "imposes an obligation to provide 'reasonable accommodations' or 'reasonable modifications' for the disabled to ensure they have meaningful access to the benefits of the programs, service, and activities that such entities provide"). Even if Indiana state law "does not require the State" to allow these voters not covered by its statute to vote by mail, that "does not mean that" allowing them to do so "cannot be a reasonable accommodation under the ADA." *See Reed v. Illinois*, 119 F. Supp. 3d 879, 884 (N.D. Ill. 2015).

**IV.  People who Live with or Care for Hoosiers with Disabilities Are Also Entitled to Vote by Mail.**

The Plaintiffs and putative class members include people who live with or care for Hoosiers with disabilities and who are concerned (or should be concerned) about infecting them. [Filing Nos. 13-6, ¶2 (Decl. of Plaintiff Katharine Black; "My husband has a compromised immune system and I cannot risk exposing him to COVID-19"); 13-8, ¶2 (Decl. of Plaintiff Chaquitta McCreary; "I have a daughter with significant asthmatic issues. It would not be advisable for me to be in a large group and potentially expose my daughter.").] Ind. Code § 3-11-10-24 does not address the situation of voters such as these who are not permitted to vote by mail under the terms of that statute but who nonetheless live with or care for COVID-vulnerable people with disabilities.[20]

During the pandemic, it is not enough to provide all Hoosiers who have disabilities with access to Indiana's vote-by-mail program. The people who come into close contact with those Hoosiers on a daily basis, i.e., the members of their households and their caregivers, must also be given access to voting by mail. In addition to the people with whom they live, people with disabilities often are in frequent contact with caregivers such as Direct Support Professionals (DSPs), who commonly assist people with intellectual and developmental disabilities, or with Personal Care Attendants (PCAs), who assist people

---

[20] In addition to allowing "a voter with disabilities" to vote by mail, the statute affords certain other groups this option. None of these other categories of voters include healthy and young or middle-aged people who live with or care for people with disabilities who are not themselves sick or injured on election day. *See* Ind. Code § 3-11-10-24(a)(3) (a voter who "will be confined on election day to the voter's residence, to a health care facility, or to a hospital because of an illness or injury during the entire twelve (12) hours that the polls are open"), § 3-11-10-24(a)(5) (a voter who "is an elderly voter"), § 3-11-10-24(a)(6) (a voter who "is prevented from voting due to the voter's care of an individual confined to a private residence because of illness or injury during the entire twelve (12) hours that the polls are open.").

with other types of disabilities.[21] Without absentee voting, household members, DSPs, PCAs and other caregivers increase their risk of infecting people with disabilities with the coronavirus.[22]

Hoosiers with disabilities who are at high risk of severe illness or death from the virus commonly share households with healthy Hoosiers who are at low risk for severe illness or death from the virus. Similarly, many at-risk Hoosiers with disabilities have daily contact with caregivers who are low-risk and healthy. By not providing access to absentee voting to low-risk Hoosiers who live in the same household or to low-risk caregivers, Indiana's vote-by-mail statute is under-inclusive even in its purported goal of protecting "voter[s] with disabilities." Ind. Code § 3-11-10-24(a)(4). Additionally, healthy Hoosiers who contract COVID-19 and do not suffer severe complications, as well as asymptomatic carriers of the disease, will routinely come into contact with Hoosiers with disabilities and place them at risk of infection. The Indiana vote-by-mail program is under-inclusive by failing to include all Hoosier voters. Doing so would slow community spread of the virus. That omission imperils the health of all Hoosiers. *Cf. Young v. UPS*, 575 U.S. 206, 229-30 (2015) (plaintiff may create a genuine issue of material fact regarding a disparate treatment discrimination claim with evidence that the employer accommodates a large percentage of nonpregnant workers while failing to accommodate a large percentage of pregnant workers).

Not extending voting by mail to the people who live with or care for people with disabilities raises at least three legal issues. First, during the pandemic, it is an inadequate accommodation for voters

---

[21] "Direct Service Providers (DSPs) include personal care attendants, direct support professionals, paraprofessionals, therapists, and others. They provide a wide variety of home and community-based, health-related services that support people with disabilities. Services provided may include personal care, activities of daily living, access to health services, and more. DSPs have close and consistent contact with people with disabilities and those providing healthcare support services in day and residential programs for people with disabilities." CDC, *Guidance for Direct Service Providers: What do Direct Service Providers for people with disabilities need to know about COVID-19?*, Coronavirus Disease 2019 (COVID-19), https://www.cdc.gov/coronavirus/2019-ncov/hcp/direct-service-providers.html (updated June 28, 2020).

[22] *See* CDC, *supra* note 8 ("It is especially important for people at increased risk, *and those who live with them,* to protect themselves from getting COVID-19" and the best way to do so is to "[l]imit your interactions with other people as much as possible"; emphasis added).

with disabilities to only extend voting by mail to them and not also to the nondisabled voters who come into close daily contact with them. *See Disabled in Action*, 752 F.3d at 197, 199, 202 (for there to be "meaningful access" to a voting program, there may need to be reasonable accommodations made in such program); *Reed*, 119 F. Supp. 3d at 883 (a "reasonable modification" provides the person "'with disabilities meaningful access to the program or services sought'"). The goal of enabling disabled voters to cast their ballots without risking infection with the coronavirus is not achieved if they can still be infected by nondisabled voters who lack access to absentee voting.

Second, it burdens the fundamental right to vote of those household members and caregivers. They are left in a similar bind to the one faced by people with disabilities: either skip voting altogether or vote in person and risk infecting not only yourself but also the people with disabilities with whom you have regular, close contact. *See Thomas v. Andino*, No. 3:20-CV-01552-JMC, 2020 U.S. Dist. LEXIS 90812, at *46, n.20 (D. S.C. May 25, 2020) ("[D]uring this pandemic, absentee voting is the safest tool . . . voters can use *to effectuate* their fundamental right to vote. To the extent that access to that tool is unduly burdened, then no matter the label, 'denial of the absentee ballot is effectively an absolute denial of the franchise [and fundamental right to vote].'"; emphasis in original).

Third, it may violate laws prohibiting discrimination against individuals who are associated with people with disabilities. *See* 42 U.S.C. §§ 12182(b)(1)(E) ("It shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association."), 12112(b)(4) ("the term 'discriminate against a qualified individual on the basis of disability' includes . . . excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association"); 28 C.F.R. § 35.130(g) ("A public entity shall not exclude or otherwise deny equal services, programs or activities to

an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.").

If a household member or caregiver, who is not otherwise qualified to vote by mail under Indiana law, makes the rational decision to forgo voting in person because they do not want to risk catching and spreading the virus to the person with disabilities with whom they have frequent contact, then that person is *in effect* being excluded from the voting programs offered by Indiana because of their "relationship or association" with an individual with disabilities. Besides harming that person, this type of de facto exclusion also harms the disability community by imposing a significant extra burden on the loved ones and caregivers of people with disabilities. *See Schneider v. County of Will*, 190 F. Supp. 2d 1082, 1091 (N.D. Ill. 2002) (warning of the damage caused by associational discrimination to individuals with disabilities and of the chilling effect it has on commerce benefiting the disability community).

**V.      Expanding Voting by Mail as Well as Other Safe Voting Options During the Pandemic Will Especially Benefit Hoosiers with Disabilities.**

   **a. Removing Barriers to Voting by Mail Will Encourage Voting by Hoosiers with Disabilities and Protect Those Unaware that They Are Disabled.**

Pre-pandemic, voters with disabilities throughout the U.S. were already 45 percent more likely to vote by mail than voters without disabilities.[23] Voting by mail helps people with disabilities for whom it is challenging to travel to the polls, who need extra time to understand the issues, and who, in general, benefit from having alternative ways to vote.[24] With the pandemic, the lives of people with disabilities are at stake, and the imperatives of preventing infection and spread of the virus can be added to that list. For these reasons, there is widespread agreement within the Indiana and national disability communities that expanding vote-by-mail opportunities during this pandemic is crucial – both to protect the health and

---

[23] Rachel Orey, *Don't Leave Voters with Disabilities Behind in the COVID-19 Response*, Bipartisan Policy Center (Mar. 31, 2020)*,* https://bipartisanpolicy.org/blog/dont-leave-voters-with-disabilities-behind-in-covid-19-response/.

[24] Jason Harris, *Voting Accessibility: Responsibilities & Rights,* ADA 30 Years: Americans with Disabilities Act (Feb. 6, 2020) https://www.adaanniversary.org/blog/2020-02-voting-accessibility.

well-being of people with disabilities and to ensure access to the ballot.[25]

Moreover, many Hoosiers with disabilities do not realize that they are disabled. They may have an undiagnosed condition or may not understand the legal implications of their impairments (e.g., the 146,000 Hoosiers with undiagnosed diabetes). To protect the health and well-being of these Hoosiers, the prudent course is to make absentee voting available to *all* registered Hoosiers.

### b. Increasing Voting by Mail Will Help Voters with Disabilities Who Vote in Person.

Increasing the overall number of eligible Hoosiers who vote by mail, rather than in person at the polls, will benefit Indiana voters with disabilities who vote in person. For a significant number of people with disabilities, voting in person is the best option given their particular needs and the voting methods currently available to them in Indiana. For example, paper absentee ballots are not accessible to many Hoosiers with visual disabilities. Currently, the only option for these Hoosiers to *privately* cast a ballot is to vote in person. As a result, people with these types of disabilities can be particularly disenfranchised in the voting process.[26]

As is obvious, Hoosiers with disabilities who vote in person are at increased risk of contracting the virus as compared with those who vote remotely.[27] Reducing the overall number of in-person voters

---

[25] *See* IDR, *Letter to the Indiana Election Commission Re: Accommodations for Voters with Disabilities* (Apr. 20, 2020) https://www.in.gov/idr/files/IDR%20Letter%20to%20Election%20Commission%20-%202020-04-20.pdf ("permitting voters to utilize 'No Excuse/No Fault' absentee voting" during the pandemic "will positively impact voters with disabilities"); National Disability Rights Network, *Statement on Elections Accessibility during the COVID-19 Pandemic* (March 17, 2020), https://www.ndrn.org/resource/statement-on-elections-accessibility-during-the-covid-19-pandemic/ (advocating for extension of "the opportunity to cast an absentee ballot to all eligible voters, without restriction").

[26] Sarah Jones, *Privacy concerns with mail-in ballots for thousands of Hoosiers who are blind: Advocates say the pandemic has brought the issue of absentee voting equality to the forefront*, 13 WTHR (June 16, 2020), https://www.wthr.com/article/news/politics/privacy-concerns-for-blind-voters/531-3bb66d49-6d90-4483-81e9-0d935bf83b6d (last visited July 27, 2020).

[27] Sabrina Gonzalez, *Vote by Mail Is One of Many Ways to Ensure the Disability Community Is Included in the Next Election,* Center for American Progress (May 19, 2020), https://www.americanprogress.org/issues/disability/news/2020/05/19/485218/vote-mail-one-many-ways-ensure-disability-community-included-next-election/ ("If proper precautions are not taken, in-person voting can be incredibly harmful to communities – and particularly dangerous for disabled individuals," which "highlights the importance of coupling in-person voting with expansion of vote by mail").

will reduce crowding at polling places, which will in turn shorten wait times and allow for more social distancing – all of which will encourage voting while reducing the risk of infection for Hoosiers with disabilities who vote in person.[28]

## CONCLUSION

During the COVID-19 pandemic, decisions affecting access to the vote should take into account the specific and diverse needs of *all voters,* including those with disabilities and the people with whom they come into close contact. Ensuring that *all* registered Indiana voters have the option to vote by mail, as well as to vote safely in person and via other accessible options, would protect the voting rights and health of all Hoosiers, and especially those with disabilities, who are particularly vulnerable to the coronavirus.

Respectfully submitted,

Date: August 11, 2020

/s/ Bridget A. Clarke

BRIDGET A. CLARKE (Cal. Bar #161320)
456 Boynton Avenue
Berkeley, CA 94707
(510) 528-7755
baclarke@comcast.net

*Attorney for Amici Curiae*
*Indiana Disability Rights, Indiana Statewide Independent Living Council, American Diabetes Association, Disability Rights Education and Defense Fund, Inc., and the Disability Rights Legal Center*

---

[28] *See* CDC, *supra* note 18 (the CDC recommends that election officials "offer alternative voting methods that minimize direct contact and reduce crowd size at polling locations").

Although this litigation concerns a vote-by-mail statute, it bears emphasis that in-person voting and remote accessible vote options should be widely available and meaningfully accessible during pandemic elections. For many people with disabilities (e.g., blind voters and voters with low literacy), traditional mail-in voting systems are not accessible. *See* IDR, *supra* note 25 (advocating "curbside voting" and "electronic ballots" during pandemic voting as accommodations for Hoosiers with disabilities); *see also* American Foundation for the Blind, *Congress Must Protect the Voting Rights of People with Disabilities* (Apr. 10, 2020), https://www.afb.org/blindness-and-low-vision/your-rights/voting-accessibility/joint-letter-acb-voting-rights (letter to Congressional leaders from AFFTB and numerous disability rights organizations explaining the barriers presented by paper ballots and urging that "accessible, secure online" options be required in COVID-19 relief legislation so that "people with disabilities may privately and independently mark, cast, and verify their ballots").